JUSTICE TRIEWEILER
concurring in part and dissenting in part.
I concur with the majority’s conclusions under Issues I, III, V, and VI. However, I do not agree with the reasons for the majority’s holding under Issue 1.1 would affirm the District Court’s summary judgment dismissing the claim of fraud and misrepresentation for the reason that plaintiff was not damaged as a result of the representations which form the basis of that claim.
I dissent from the majority’s conclusions under Issues II and IV.
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
After reviewing the record, I conclude that plaintiff has alleged sufficient facts to submit the issue of intentional infliction of emotional distress to the jury.
Summary judgment should never serve as a substitute for jury trial where there are issues of material fact. Beaverhead Bar Supply, Inc. v. Harrington (1991), 247 Mont. 117, 805 P.2d 560.
The Church, as the moving party, had the burden of establishing both the complete absence of any genuine issues of material fact and entitlement to a judgment as a matter of law. All reasonable inferences that might be drawn from the offered evidence must be drawn in favor of the party opposing summary judgment. Cereck v. Albertson’s, Inc. (1981), 195 Mont. 409, 637 P.2d 509.
This Court’s previous decisions establish two requirements that must be met before a claim for intentional infliction of emotional distress may be submitted to a jury. First, as pointed out by the majority, we must find as a matter of law that there are facts alleged which, if proven, would establish that the defendant’s conduct was so outrageous in character that it is utterly intolerable in a civilized society. Frigon v. Morrison-Maierle, Inc. (1988), 233 Mont. 113, 123, 760 P.2d 57, 63-64. Second, plaintiff must have suffered “severe emotional distress” as a result of that conduct. The cause of action cannot be sustained where a plaintiff suffers exaggerated and unreasonable emotional distress under the circumstances. First Bank *307 (N.A.)-Billings v. Clark (1989), 236 Mont. 195, 206, 771 P.2d 84, 91. Finally, we held in Clark that “[i]t is for the court to determine whether, on the evidence, severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.” Clark, 771 P.2d at 91. I conclude that based upon the testimony of plaintiff, it can be found. The jury should have been allowed to determine whether in fact it existed. I offer the following examples of conduct, and plaintiff’s reactions to that conduct, in support of this conclusion:
1. Prior to plaintiff’s suit to recover her medical payments, local officials from her Church visited her while she was recovering from surgery and threatened to excommunicate her if she sued the Church.
2. Plaintiff’s Temple Recommend was denied because she would not agree to tithe ten percent of her judgment to the Church and she would not dismiss her suit as requested by the Church. Because her dependence on the Church was so strong, she was devastated by this denial.
3. Plaintiff’s Church calling was denied for the same reasons.
4. Plaintiff was subjected to unannounced visits from male Church leaders to discuss the status of her lawsuit at unusual hours of the day and under unusual circumstances. For example, she was visited late at night when none of her family members were at home and when she was in the process of recovering from one or more of the numerous surgical procedures that she underwent.
5. During one unannounced evening visit to plaintiff shortly after her sixth surgical procedure, a Church representative told her that he did not want to receive any more medical bills and that he was ordering the Relief Society to discontinue delivering the meals which had been delivered to her during her period of convalescence. She was too ill to cook or care for herself, and as a result, she had to move in with her brother’s family for six months.
6. Plaintiff was repeatedly given inconsistent and contradictory instructions by Church officials. On one occasion she would be told not to worry about her medical bills. However, the Church would then repeatedly refuse to pay those bills. This occurred during a time when plaintiff was in poor physical condition. She underwent six separate surgical procedures to her cervical spine and one surgical procedure to repair her vocal cords. She testified that she lived in constant fear that she would be denied medical care because she could not pay her bills.
7. Church officials repeatedly pressured plaintiff to sign releases, even though her medical condition, including her need for further *308 care, had not been resolved. The Church also conditioned payment of her outstanding medical bills on her willingness to sign documents releasing the Church from farther liability.
8. At one point, plaintiff was told by a Church leader that any money the Church gave her for medical bills would come out of the ward fast offerings, and told her that she would be hurting the people of Kalispell if she proceeded further. Neither statement was true.
9. Church leaders told plaintiff she was “unworthy” and “dishonest” because of the suit she had initiated.
10. Plaintiff’s psychologist testified that she suffered a feeling of loss and betrayal as a result of the Church’s actions toward her. The deterioration of her relationship with the Church, on which she had felt very dependent, contributed significantly to her level of emotional distress. Plaintiff was a devout and dedicated member of the Church since 1975 and had tithed $75,000 to the Church over the ten-year period from 1975 to 1985. The president of the Church wrote in a letter to the Church’s Risk Management Division on April 26,1985, that:
Sister Davis is a stalwart faithful member of the Church. She was working in a capacity at the time [of the accident] to which the Church had assigned to her. She does not have insurance and indicated it would be years before she could satisfy the bills accruing from the accident.
I conclude under these circumstances that there was in fact evidence of conduct by Church officials which was utterly intolerable in a civilized community and that their conduct had a significant impact on the plaintiff from which it could be found that she suffered severe emotional distress. Whether the evidence was to be believed and the extent to which plaintiff was damaged from this conduct, if it was believed, were matters for the jury to decide.
ORDER IN LIMINE REGARDING CHURCH DOCTRINE
The majority has excluded evidence that local Church officials in Kalispell threatened to excommunicate the plaintiff and denied her Temple Recommend and Church calling because of her refusal to dismiss the claim against them and her refusal to tithe a portion of her judgment to the Church. The basis for the majority’s conclusion is that this conduct by local Church officials related to matters of Church discipline and teachings which are protected by the First Amendment. However, there is no evidence in this record that any of the conduct complained of by plaintiff was based upon Church *309 teachings or Church doctrine. In fact, all of the evidence is to the contrary. Plaintiff had to sue the Church to recover payment for her medical expenses which resulted from injuries sustained on Church property while engaged in Church activity. Allen Swan, the Church’s attorney from Salt Lake City, Utah, testified that it was the tradition of the Church to assume responsibility for these expenses. According to the Church’s attorney, there was no basis in Church doctrine for the efforts of local officials to frustrate plaintiff’s attempt to have these bills paid.
Furthermore, it was the advice of the Church’s attorney that plaintiff’s calling and Temple Recommend be considered by local officials without regard to the pending civil action. Certainly that recommendation would not have been made if it was contrary to Church doctrine.
In the face of these indications that local Church officials were actually acting contrary to Church doctrine when they threatened plaintiff with excommunication and denied her Church privileges, there is absolutely no evidence in the record that any of their efforts to deprive her of her civil remedies were based on Church doctrine. The majority’s conclusions to the contrary are sheer speculation. For these reasons, I would reverse the District Court’s order in limine which excluded evidence that plaintiff was threatened with excommunication and denied privileges based upon her judicial enforcement of basic rights under the laws of Montana.
For these reasons, I dissent from the majority opinion. I would reverse the judgment of the District Court which denied plaintiff the right to submit her claim for intentional infliction of emotional distress to a jury, and I would allow evidence of local Church officials’ threats of excommunication and denial of plaintiff’s Church privileges based upon her effort to recover payment for her medical expenses.
JUSTICE HUNT joins in the foregoing concurrence and dissent.
JUSTICE HARRISON
dissenting.
I join in the dissent of Justice Terry N. Trieweiler but I would also dissent to the majority’s conclusions on Issues I and III. Unlike the majority, I would hold that fraud is clearly a matter for the jury to decide under the case law of this state.
As to Issue III, I would concur in the appellant Davis’ argument that the fiduciary relationship between herself and the Church was much broader than characterized by the Church and as a result, the *310 Church had a duty to act in her best interest. I would find that the Church’s actions were not privileged and that the facts demonstrate a willful and deliberate breach of the Church’s fiduciary duty to its members.
Although I concur in the majority’s conclusion under Issue VI, that the District Court did not err when it refused the Church’s request to amend its answer to include the defense of charitable immunity, I would elaborate on the reasons. As the federal district court noted in Howard v. Sisters of Charity of Leavenworth (D. Mont. 1961), 193 F.Supp. 191, 193, the trend of judicial opinion has been to reject the doctrine of charitable immunity. In addition the LDS Church is not in need of the protection once considered necessary to protect charitable organizations from liability. Here we have a highly sophisticated and affluent institution that has been indemnified from injury claims through its own risk management division.