No. 90-287

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

BEAVERHEAD BAR SUPPLY, INC.,
a Montana corporation,

      Plaintiff and Appellant,

-v-

DONALD P. HARRINGTON, d/b/a
HARRINGTON BOTTLING COMPANY,

      Defendant and Respondent.



APPEAL FROM:   District Court of the Fifth Judicial District,
In and for the County of Beaverhead,
The Honorable Frank Davis, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Frank B. Morrison, Jr., & John M. Morrison; Morrison
Law Offices, Helena, Montana

    For Respondent:

        Donald C. Robinson; Poore, Roth & Robinson; Butte,
Montana

Submitted on Briefs:  November 8, 1990

Decided:  February 1, 1991

Filed:

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

The plaintiff Beaverhead Bar Supply (Beaverhead) appeals the order of the Montana Fifth Judicial District Court, Beaverhead County, granting the defendant Donald P. Harrington, d/b/a/ Harrington Bottling Company (Harrington), summary judgment on Beaverhead's claims of breach of contract and breach of the implied covenant of good faith and fair dealing. We reverse.

The plaintiff raises several issues on appeal, which we restate as follows:

1) Did the District Court err in concluding as a matter of law that no contract existed between the parties?

2) Does the statute of frauds bar the plaintiff from seeking enforcement of an alleged oral agreement on the grounds that the agreement could not be performed within one year?

3) Does the implied covenant of good faith and fair dealing apply to the relationship alleged in this case?

In 1978, Dan Carpita, Jr. (Carpita) began negotiating an agreement with his father (Carpita, Sr.) to purchase his father's interest in Beaverhead Bar Supply for $294,705.00. Carpita was also contemplating a $300,000.00 expansion over five years. The terms of the agreement called for a down payment of $85,000.00 and monthly payments of $1,754.08 over 20 years. At the time, Pepsi-Cola products allegedly represented approximately 30% of Beaverhead's inventory and approximately $7000.00 to $8000.00 per month gross profit. Beaverhead obtained all of its Pepsi products

from Harrington on an order basis.

As part of negotiations, Carpita sought assurances from Beaverhead's major suppliers for their continued business. Both Carpita and Carpita, Sr. allegedly met with Don Harrington in Harrington's office and explained the proposed financial transaction and expansion. They allegedly advised Harrington of the terms of their agreement and told him that Carpita was also planning on incurring additional debt of approximately $300,000.00 for expansion of Beaverhead. Carpita alleges that they explained to Harrington that in order to effectively carry out this plan for sale and expansion that it was necessary for Beaverhead to maintain the Pepsi-Cola distributorship in order to service the proposed debt.

Harrington alleges that while the Carpitas did inform him of the transfer of ownership of Beaverhead, no such in-depth discussion took place.

In 1979, Harrington began directly distributing Pepsi-Cola products in adjacent Madison County, thus removing that market from what had been part of Beaverhead's distribution area. In 1982, an agent of Harrington allegedly came to Carpita and asked if Beaverhead was for sale. Carpita informed him that it was not. Due to these two incidents, Carpita claims that he began to be concerned about the intentions of Harrington sometime in 1983. About this time Harrington suggested that Carpita invest more heavily in an aggressive promotion of Pepsi-Cola products and

3

Carpita stated that as a prerequisite to additional investment, he would need the alleged oral assurance of Harrington for a continued relationship, put into a written contract. Don Harrington allegedly agreed to "work up" a written contract.

In June of 1984, Carpita, Sr. died leaving Harrington and Carpita as the only witnesses to the alleged 1978 agreement. In August, Harrington's agent presented Carpita a proposed written contract providing for a termination of the bottler-distributor relationship "at will." Carpita counterproposed certain terms reflecting the continuation of the alleged 1978 agreement.

On December 18, 1984 Don Harrington notified Carpita that effective January 7, 1985, Harrington Bottling would begin distributing Pepsi-Cola products directly and would no longer make those products available to Beaverhead. Beaverhead filed suit in June of 1985, alleging that as a result of the termination it lost over $90,000.00 a year, approximately one-third of its income, and entirely lost 65 accounts as a result of the termination, of which approximately 39 were allegedly developed since 1978 through the efforts of Carpita. Beaverhead alleges that the loss of this income has brought it to the brink of insolvency.

Harrington moved for summary judgment, which the District Court granted on April 26, 1990, and subsequently amended its order on May 4, 1990. Beaverhead now appeals.

In its order granting summary judgment, the District Court concluded that there existed a "vague, indefinite, and uncertain,"

4

type of relationship between the parties, but that no contract existed between them. Consequently, the court found no implied covenant of good faith and fair dealing attendant to a contract. Moreover, the court concluded that the statute of frauds, § 28-2-903, MCA, bars enforcement of whatever oral relationship or agreement may have existed between the parties.

We disagree. Summary judgment under Rule 56(c), M.R.Civ.P. is proper only if the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Reaves v. Reinbold (1980), 189 Mont. 284, 287, 615 P.2d 896, 898. While it is true that the purpose of summary judgment is to encourage judicial economy, it is also true that the procedure is never to be a substitute for trial if a material factual controversy exists. Reaves, 615 P.2d at 898. In Reaves we held that there was a genuine issue of material fact as to the existence of an oral contract for $900.00 a month salary that precluded summary judgment. Reeves, 615 P.2d 898-99. Similarly, in this case there are genuine issues of material fact regarding whether Beaverhead and Harrington had a contract based on the 1978 meeting. This factual dispute is more evident in the deposition testimony of the parties. In his deposition, Harrington testified as follows:

Q.   At the time that Dan purchased the business from his father, do you recall a meeting in Butte with Carpita, Sr. and Dan and yourself present?
A.   Yes.
Q.   Where was that meeting held?
A.   It was in our old offices at the plant here, and

5

Dan, Sr. put his head in the door and he said, "I'm turning this business over to young Dan," and he says, "But I'm going to be around to look after it for awhile."

Q. Was that the extent of the meeting?

A. It was very brief.

Q. Did anybody come in and sit down in your office?

A. No, never did. Dan was standing there and his dad was standing there, right in the door of the office.

Q. And what was said by you?

A. As I recall, I said something to the effect that, "If he does as good a job as you did, well, things will be okay," or words to that effect.

Q. If other people testify that something like that was said, you wouldn't disagree with it? In fact, you do remember saying something like that?

A. Correct. Dan's dad was a good businessman.

Carpita's account of the meeting given in his deposition differs

substantially:

Q. Mr. Harrington was asked this morning about a conversation that took place between he and your father back at about the time you were taking over the business from your father here in Butte. Did you witness that conversation?

A. I did.

Q. What is your recollection of where that conversation took place?

A. It took place in Don's office on Holmes Avenue.

Q. And Mr. Harrington testified that while he was in his office, your father stuck his head in the door and indicated, said something to the effect that you had taken over the business, and he was being advised of that, so to speak, and Mr. Harrington indicated that that was fine and wished you all well, and said something to the effect that if you did as good a job as your, as Dan, Sr. did, everything will be okay, or words to that effect.

Is that your recollection of the conversation?

A. No.

Q. What is your recollection of the conversation?

A. We called and made an appointment to see Don and made a specific trip for that reason. We spent some three hours in Don's office and explained the financial transaction between my father and I and also the transaction with the expansion of the business, building, et cetera.

Q. Who participated in that conversation?

A. My dad, Don and myself.

A. [I] [e]xplained the financial situation and pointed out to him the importance of having it, because nothing could take--I couldn't service the debt to him. I couldn't service the debt for the expansion without it.
Q. Without what?
A. Without Pepsi-Cola.
. . .
A. . . . [A]t the time the first discussion took place, I asked Don if we needed something in writing. And he says, "A handshake should always be good enough. It always has been."
Q. When did he say that?
A. In 1978.
Q. He said, "You have a handshake." Did you shake hands?
A. Yes.
Q. What did you shake hands over?
A. Over the discussion, over the relationship, over the friendship that we assumed after 30 years that we have.
Q. Did he say anything to the effect about, or compliment your father and say If [sic] things went like your father ran the business, that he thought everything would be okay, or words to those [sic] effect?
A. What the words were to the effect was that we had always enjoyed a good relationship. We didn't see any reason to change anything if it kept going.
Q. That isn't my question, Mr. Carpita. My question is, did he ever say anything to the effect that your father had done an excellent job and that if you continued along the same lines, that everything would be okay?
A. No.
Q. He didn't say that?
A. That was not the specific words that he said.
Q. Did he say words to that effect?
A. The words to the effect that I just said, that we had always enjoyed a good relationship.
Q. By "we", he meant he and your father, right?
A. Beaverhead Bar Supply.

In light of the deposition testimony and the continued relationship of the parties for some 30 years there is a genuine issue of material fact regarding whether an agreement was made at the 1978 meeting, and what was that agreement. Furthermore, if an agreement was made, the deposition testimony indicates that factual issues

7

exist regarding the length of the contract's term. According to Harrington's testimony, such a contract could be construed as being "for so long as Beaverhead continued to perform satisfactorily", measured comparatively to the performance of Beaverhead under Carpita, Sr. See, e.g., Burgermeister Brewing Corp. v. Bowman (1964), 227 Cal.App.2d 274, 38 Cal.Rptr. 597. Or, as Beaverhead argues in its brief, the term of the contract could be construed as an exclusive distributorship of Pepsi-Cola products for an implied term of twenty years, i.e. the time necessary for Beaverhead to service its debt. Finally, according to Carpita's testimony that "we had always enjoyed a good relationship [and] [w]e didn't see any reason to change anything if it kept going" the contract could be construed as providing for termination at will. See e.g., Bronken's Good Time Co. v. J. W. Brown & Associates (1983), 203 Mont. 427, 661 P.2d 861.

The District Court also ruled that the statute of frauds barred enforcement of any agreement that may have existed between the parties. Again, we disagree. The statute provides that an agreement that by its terms is not to be performed within a year from the making thereof must be in writing. Section 28-2-903(1)(a), MCA. Evidence of such an agreement is not admissible without the writing or secondary evidence of its contents. Section 28-2-903(2), MCA.

However, courts have uniformly construed this provision narrowly. If there is any possibility that a contract may be

performed within one year, it is not within the statute. 2 Corbin on Contracts, § 444 at 535; Farnsworth, Contracts, § 6.4 at 392. Thus, the issues of fact regarding the terms of the alleged oral agreement discussed hereinabove are also material toward determining whether the statute bars enforcement of the alleged agreement. Assuming arguendo that there is an oral contract, if its term is for "so long as Beaverhead continued to perform satisfactorily" Harrington could not terminate the contract at will. Rather, the contract would be one of indefinite duration that, depending upon Beaverhead's performance, might possibly be performed within one year, and therefore enforcement would not be barred by the statute. Burgermeister, 38 Cal.Rptr. at 601-602. On the other hand, if the jury finds that the oral contract was for a twenty-year term--thus enabling Beaverhead to service the debt incurred in expansion--enforcement is clearly barred by the statute because by its terms such a contract cannot possibly be performed within a year. Section 28-2-903(1)(a), MCA. Finally, if the alleged oral contract was terminable at will, the rule of Bronken's Good Time Co. v. J. W. Brown & Associates, supra, as to reasonable notice of termination applies. If so, Beaverhead is entitled to reasonable notice of termination. As to what is a reasonable amount of time is a question of fact. Bronken's, 661 P.2d at 864. If the jury finds that a reasonable amount of time to be given by a notice to terminate exceeds one year, then such contract, being wholly oral, is unenforceable. Section 28-2-903(1)(a), MCA; San

9

Francisco Brewing Corp. v. Bowman (Cal.1959), 343 P.2d 1, 7, also discussed in appeal after remand, Burgermeister Brewing Corp., supra, 38 Cal.Rptr. at 602.

Beaverhead's final issue on appeal asks us to rule on whether the implied covenant of good faith and fair dealing applies to the relationship alleged in this case. In order for Beaverhead to recover from Harrington on a theory of breach of the implied covenant, there must be an enforceable contract to which the covenant attends. See Story v. City of Bozeman (1990), 242 Mont. 436, 450, 791 P.2d 767, 775. In Story we held that "every contract, regardless of type, contains an implied covenant of good faith and fair dealing." In essence, the covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance. Story, 791 P.2d at 775.

First, we note that this case is before us on appeal from an order granting summary judgment. We decline to rule on application of the covenant in this case where only a sparse record has been developed at this point and where there are still genuine factual issues to be resolved regarding the existence and enforceability of the alleged contract. However, we do note that Beaverhead correctly concedes in its brief that even if it can prove a breach of the implied covenant, it cannot prove that it entered into the contract for a non-profit motivation and thus any damages it might

recover will be limited to contractual remedies. <u>Story</u>, 791 P.2d at 776.

We conclude that there are genuine issues of material fact regarding the existence of a contract and its enforceability that preclude summary judgment under Rule 56(c), M.R.Civ.P. We therefore reverse the order of the District Court granting summary judgment.

**REVERSED and REMANDED for further proceedings consistent with this opinion.**

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
Honorable Peter L. Rapkoch,
District Judge, sitting in
place of Justice John C. Sheehy

11