05-098

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 263

JOHN M. PHELPS and JOHN PHELPS, P.C.,

　　　　Plaintiffs and Appellants,

　　v.

SEAN S. FRAMPTON and SEAN S. FRAMPTON, P.C.,

　　　　Defendants and Appellees.

APPEAL FROM:　　District Court of the Eleventh Judicial District,
　　　　　　　　In and For the County of Flathead, Cause No. DV 2003-156B
　　　　　　　　Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

　　　　For Appellants:

　　　　　　James P. Molloy, Molloy Law Firm, Helena, Montana

　　　　For Appellees:

　　　　　　Sean S. Frampton, Morrison & Frampton, PLLP, Whitefish, Montana

　　　　　　　　　　Submitted on Briefs:　December 14, 2005

　　　　　　　　　　　　　　　Decided:　October 22, 2007

Filed:

　　　　_____
　　　　　　　　　　　Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 John M. Phelps and John M. Phelps, P.C. (collectively, "Phelps") appeal from the order and final judgment of the District Court for the Eleventh Judicial District, Flathead County, granting summary judgment in favor of Sean S. Frampton and Sean S. Frampton, P.C. (collectively, "Frampton") and dismissing Phelps's complaint on the merits with prejudice. We affirm.

¶2 The sole issue on appeal is whether the District Court erred in granting summary judgment in favor of Frampton on each of the claims set forth in Phelps's complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Partnership Agreement

¶3 The law firm of Hedman, Hileman & Lacosta, P.L.L.P. ("the Firm") is a partnership located in Whitefish, Montana. The three original partners are Donald E. Hedman, William E. Hileman, Jr., and Susan M. Lacosta. Phelps joined the Firm as an equal partner in 1996. Frampton joined as an associate in 1996 and was admitted as an equal partner in 1999.

¶4 The operation of the Firm is controlled by a partnership agreement ("Agreement" or "Partnership Agreement"), which includes the 1980 formation agreement, a 1999 addendum, and a 2001 amendment. With respect to partnership draws, the Agreement provides, in pertinent part:

> 3. <u>Partnership Draws</u>: Except as otherwise provided herein, each partner will keep 50% (or such other percentage unanimously agreed upon by the partners) of the monthly fees paid and properly credited as his/her own. Such percentage shall be determined under the existing fee credit system using hourly rates for all attorneys with the remaining percentage to

2

be retained in a partnership pool from which all overhead expenses will be paid.

. . . .

d)      Any partners whose gross income reaches the sum of $200,000 in any calendar year shall be relieved of further contributions to the partnership pool for the remainder of said year, and shall be entitled to keep 100% of the fees paid and properly credited as his/her own in excess of $200,000 for said year.

In essence, a partner's contribution to the partnership pool of 50% of his or her monthly fees is capped at $100,000 per year; thus, after a partner has contributed $100,000 in a given year, the partner retains 100% of the monthly fees paid and properly credited as his or her own.

¶5      With respect to work on contingent-fee cases shared among partners, the Agreement states:

6. Shared Work:  In light of the policy [to develop specialties within the Firm] set forth in Paragraph 2 above, when two or more partners henceforth work together on a case, the following fee arrangement shall be followed:

a.      Hourly Cases: . . . .

b.      Contingent Fee Cases:  Each partner is entitled to receive part of a fee earned based upon (1) each partner's percentage of the total time spent on the case, or (2) a pre-determined percentage split which shall take into consideration such factors as origination of the case/client, etc.

**The Gallagher Case**

¶6      On or about May 26, 2000, four individuals were killed in an automobile accident in which a side saddle fuel tank exploded.  V.M., a relative of the deceased, worked as a

clerk for Whitefish City Judge Bradley F. Johnson, who assisted V.M. in obtaining legal representation to protect her rights and interests and to pursue a claim against General Motors ("the Gallagher case"). In particular, Johnson recommended that V.M. contact Frampton. As Johnson later explained in a January 15, 2004 affidavit filed in the case at hand:

> I recommended that [V.M.] contact Sean Frampton, who she knew by virtue of his position as Whitefish City Prosecutor. [V.M.] generally distrusted lawyers, but I knew that she needed to have a legal representative to protect her rights and interests during a very unsettling time. I spoke with Sean about the need for representation and the scope of representation, to include a lawyer with the ability and expertise to pursue a claim against GM and to promptly preserve evidence (witness accounts and physical evidence). I felt that Sean had the legal acumen and the personal relationship with [V.M.] that was appropriate to the matters. I did not refer the case generally to the Hedman, Hileman and Lacosta law firm because [V.M.] did not like some of the other members of the firm. She did express her like for and trust in Sean, individually.

¶7 V.M. and the personal representative of the decedents' estates thereafter met with Frampton about the Gallagher case and signed contingent-fee agreements with the Firm. In a June 7, 2004 affidavit, V.M. stated:

> I did not refer this case to either John Phelps or the law firm of Hedman, Hileman, & Lacosta. Sean Frampton was the lawyer I sent the case to. I considered Sean Frampton to be our lawyer on this matter. . . . Although I knew Gene Hedman, Bill Hileman, Susan Lacosta, and John Phelps, I did not have a relationship with them. I knew Sean Frampton and had a relationship with him, and knew that I could trust him with this very important matter. [Paragraph break omitted.]

¶8 Frampton and Hileman agreed to work on the Gallagher case together and entered into an agreement regarding the sharing of work and splitting of fees on the case. They involved a Georgia law firm and another Montana law firm with more expertise in

4

bringing this type of lawsuit. The Georgia firm agreed to pay all case expenses. It is undisputed that Phelps performed no legal services on the Gallagher case.

¶9 The Gallagher case settled in April 2002. As part of the settlement, the Georgia firm sent a check payable to "Hedman, Hileman & LaCosta, P.L.L.P." for approximately $1.8 million ("the Gallagher fee"). Of this amount, 55% was allocated to Frampton and the other 45% was allocated to Hileman pursuant to their predetermined percentage split. Frampton and Hileman contributed to the partnership pool until they each reached the $100,000 contribution cap. In addition, they gave bonuses to Hedman, Phelps, and the Firm's employees. (Apparently, Lacosta was not given a bonus because Hileman, to whom Lacosta was married, had indicated that she would receive a bonus from his 45% share of the Gallagher fee.) The amount of the bonuses given to Hedman and Phelps was $25,000 each, with no obligation to contribute any of this amount to the partnership pool. Phelps, however, was unsatisfied with this amount and returned his bonus.

**The Release**

¶10 Believing that $120,000 would be a more appropriate amount for a bonus, Phelps retained counsel to represent him in his fee dispute with Frampton and Hileman. Phelps eventually settled with Hileman, and, as part of the settlement, Phelps released the Firm from any claims that he might have against it related to the allocation of the Gallagher fee. However, Phelps specifically reserved any such claims against Frampton.

***Phelps v. Frampton***

¶11 Phelps initiated the instant lawsuit on March 17, 2003, asserting six claims against Frampton. (Phelps subsequently filed an amended complaint; however, the substance of

5

his allegations remained substantially the same.) Under Count I ("Breach of Written Contract"), Phelps alleged that partnership net profits are allocated under the Agreement pursuant to the number of partnership units held by each partner and that he held one partnership unit out of the five partnership units outstanding (i.e., a 20% share) during the period at issue here. Phelps further alleged that a partner is entitled to a distribution of the fees that he or she has earned and that have been properly credited as his or her own, but that "[t]he Agreement does not, however, address or provide how a referral fee like the one received from [the Gallagher case] should be allocated." Consequently, according to Phelps, Frampton "breached the Agreement" by "keep[ing] the disproportionately large share of the fee from [the Gallagher case]," and "Phelps is entitled to 20% of the fee wrongfully retained by Frampton in breach of the Agreement."

¶12 Under Count II ("§§ 35-10-106(1) and 35-10-401(2), MCA"), Phelps alleged that "[b]ecause the Agreement does not address the allocation of a referral fee like the one received from [the Gallagher case], §§ 35-10-106(1) and 35-10-401(2), MCA require that the fee be shared equally by all [five] partners." Under Count III ("Breach of Oral Contract - Promissory Estoppel"), Phelps alleged that Frampton had orally agreed with Phelps "to share a substantial portion of the fee that he received from [the Gallagher case] with the other Hedman firm partners," that "[i]n reliance upon Frampton's assurances, Phelps forewent another employment opportunity that was available to him," and that "Frampton's failure and refusal to pay Phelps a 20% share is a breach of Frampton's oral contract." Under Count IV ("Breach of Covenant of Good Faith and Fair Dealing"), Phelps alleged that "Frampton breached the covenant of good faith and fair dealing by

6

claiming and retaining an extraordinarily large sum as his sole property and refusing to pay Phelps his share." Under Count V ("Breach of Fiduciary Duty"), Phelps alleged that Frampton owed "a fiduciary duty to Phelps in connection with his appropriation of partnership property or opportunity" and that Frampton breached this duty "by claiming and retaining an extraordinarily large sum as his sole property and refusing to pay Phelps his share." Lastly, under Count VI ("Constructive Trust"), Phelps alleged that "Frampton derived property or benefit by appropriation of partnership property or opportunity" and that "Frampton would . . . be unjustly enriched if he were permitted to retain the extraordinarily large sum that he took as his sole property." Thus, according to Phelps, "[a] constructive trust should be imposed on the fee to insure that Phelps receive [sic] a 20% share of it."

¶13    On April 23, 2003, Frampton answered Phelps's complaint and alleged, as an affirmative defense, that Phelps's settlement with the Firm "constituted an accord and satisfaction and bars any further litigation of this matter." Frampton also asserted a counterclaim for "abuse of process." On January 9, 2004, Frampton filed a motion styled as a motion to dismiss and/or for summary judgment on all counts of Phelps's complaint. In his supporting brief, Frampton argued, among other things, that Phelps's claims all arose out of the allocation of the Gallagher fee and, as such, were claims against the Firm, not Frampton. "[The Firm] distributed the fees. If the distribution was wrong as alleged by [Phelps] . . . , then it was [the Firm] which breached the [Agreement]." Phelps filed two briefs opposing Frampton's motions, and Frampton filed a reply.

7

¶14 On September 28, 2004, following briefing and oral argument, the District Court granted summary judgment in favor of Frampton on all counts of Phelps's complaint. (The court's reasoning will be discussed below where relevant.) The court entered judgment on October 12, 2004, dismissing Phelps's complaint on the merits with prejudice. Noting that Frampton's counterclaim was still pending, however, Phelps filed a motion under M. R. Civ. P. 54(b) for the entry of final judgment on his claims, which the court granted on December 7, 2004. Phelps now appeals.

## STANDARD OF REVIEW

¶15 We review de novo a district court's ruling on a motion for summary judgment, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Cole v. Valley Ice Garden, L.L.C.*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. Rule 56(c) provides that a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences are to be drawn therefrom in favor of the party opposing summary judgment. *Redies v. Attorneys Liability Protection Soc.*, 2007 MT 9, ¶ 26, 335 Mont. 233, ¶ 26, 150 P.3d 930, ¶ 26; *Prindel v. Ravalli County*, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19.

¶16 The party moving for summary judgment bears the initial burden of establishing the absence of any genuine issue of material fact and entitlement to judgment as a matter

of law.  *Prindel*, ¶ 19; *Hughes v. Lynch*, 2007 MT 177, ¶ 8, 338 Mont. 214, ¶ 8, 164 P.3d 913, ¶ 8.  If this burden is met, the burden shifts to the nonmoving party to establish with substantial evidence, as opposed to mere denial, speculation, or conclusory assertions, that a genuine issue of material fact does exist or that the moving party is not entitled to prevail under the applicable law.  *See Cole*, ¶ 4; *Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997).  The determination that the moving party is or is not entitled to judgment as a matter of law is a legal conclusion, which we review for correctness.  *Hughes*, ¶ 8; *Hi-Tech Motors v. Bombardier Motor Corp.*, 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32.

**DISCUSSION**

¶17    ***Did the District Court err in granting summary judgment in favor of Frampton on each of the claims set forth in Phelps's complaint?***

**I.      The Breach of Written Contract Claim**

¶18    In its order granting summary judgment in favor of Frampton, the District Court determined that Judge Johnson referred, and V.M. brought, the Gallagher case to Frampton "individually," not to the Firm generally, and that Phelps "had no role in the origination of the case or client."  The court further determined that allocation of the Gallagher fee was addressed and governed by the Agreement, that the Gallagher fee was a fee "earned," and that Frampton was entitled to retain the amount of the Gallagher fee that exceeded his required contribution to the partnership pool (less the 45% to which Hileman was entitled).  In addition, the court concluded that "any claim for breach of [the Agreement] must be with [the Firm].  As Phelps has reached a settlement with [the Firm],

9

this part of the claim is moot." Accordingly, the court granted summary judgment in favor of Frampton on Count I.

¶19 On appeal, Phelps challenges the District Court's reasoning on a number of grounds. For instance, Phelps asserts that the language of the Agreement is "ambiguous" with respect to how the Gallagher fee should have been allocated, thus creating a genuine issue of material fact as to the partners' intent; that Frampton did not "earn" the Gallagher fee as that term is used in the Agreement; that Frampton would not have become involved in the Gallagher case "but for" his relationship with the Firm and Phelps's "key role" in preserving and maintaining the Firm's relationship with the City of Whitefish; and that the Gallagher fee was "unique in the history of [the Firm]" and, thus, was "not the type of fee contemplated by or addressed in [the Agreement]."

¶20 Yet, all of these arguments pertain to the correctness of the allocation of the Gallagher fee, which was paid directly to the Firm and was then allocated through the Firm. Indeed, the substance of Phelps's breach of written contract claim is that *the Firm* misallocated the fee. As alleged in his complaint:

> [The Gallagher fee] should have been allocated to the Hedman Firm partnership and been included in the calculation of the partnership's net profits. Accordingly, Phelps is entitled to 20% of the fee wrongfully retained by Frampton in breach of the Agreement.

Although Phelps has attempted throughout this litigation to portray the supposed "breach of written contract" as one perpetrated by Frampton, the allegations comprising Phelps's breach of written contract claim do not identify an obligation under the Agreement and a *corresponding* breach of that obligation by Frampton. Rather, Phelps has consistently

10

relied on provisions of the Agreement which, if his interpretations are correct, *the Firm* allegedly breached.

¶21 Phelps argues that because he specifically reserved his claims against Frampton when he settled with Hileman and released the Firm, he may now pursue a breach of written contract claim against Frampton. However, this argument misses the point, which is that Phelps's breach of written contract claim—as that claim is framed in his complaint—is, in essence, one against the Firm, not Frampton. Phelps also quotes the following language from § 35-10-409(2), MCA: "A partner may maintain an action against the partnership or another partner for legal or equitable relief . . . ." But this language merely establishes that Phelps may maintain an action against Frampton, not that Phelps has, in fact, done so.

¶22 For the foregoing reasons, we conclude that Phelps's claim for breach of written contract is directed at acts or omissions of the Firm. In this regard, we note that Phelps is now barred by the release he entered into with the Firm from bringing any claims against the Firm related to the allocation of the Gallagher fee. Although Phelps specifically reserved his claims against Frampton, Phelps may not employ Frampton as a stand-in defendant on a claim that is, in substance, against the Firm. Accordingly, we affirm the District Court's grant of summary judgment in favor of Frampton on the Breach of Written Contract claim.

## II. The §§ 35-10-106(1) and -401(2), MCA, Claim

¶23 As noted above, Phelps relied on §§ 35-10-106(1) and -401(2), MCA, for purposes of Count II. The former provides, in pertinent part, that "a partnership agreement

11

governs relations among the partners and between the partners and the partnership. *To the extent the partnership agreement does not otherwise provide, this chapter governs relations among the partners and between the partners and the partnership.*" Section 35-10-106(1), MCA (emphasis added). The latter provides, in pertinent part, that "[a] partnership shall credit each partner's account with *an equal share* of the partnership profits." Section 35-10-401(2), MCA (emphasis added). Phelps alleged that "the Agreement does not address the allocation of a referral fee like the one received from [the Gallagher case]" and that §§ 35-10-106(1) and -401(2), MCA, therefore, "require that the fee be shared equally by all [five] partners."

¶24 Responding to Phelps's allegations, Frampton argued in his brief in support of his summary judgment motion that neither of these provisions applied here "because [the Firm] was operated pursuant to a Partnership Agreement that covered fee distribution." In this regard, Frampton pointed out that Title 35, Chapter 10, MCA, applies only "[t]o the extent the partnership agreement does not otherwise provide," § 35-10-106(1), MCA.

¶25 The District Court agreed with Frampton, stating that "it is clear that the $1.8 million is a fee earned, the allocation of which is governed by the Partnership Agreement." The court reasoned that "[t]he Partnership Agreement reveals that the relationship among these lawyers allows a large fee-generating partner, such as one doing contingency work, to retain a disparate proportion of fees compared to a partner billing only hourly." Accordingly, the court concluded that the Agreement "addresses fees such as the one at issue" and that the court, thus, did not need to consider the statutory provisions cited by Phelps.

¶26 Phelps contends that the District Court erred because "[the Agreement] did not address the allocation of a fee like that received from [the Gallagher case]. Thus, sections 35-10-106(1) and 35-10-401(2) govern." Phelps supports this contention with two of the same theories mentioned above in the Breach of Written Contract discussion—namely, the language of the Agreement is ambiguous with respect to how the Gallagher fee should have been allocated, and the Gallagher fee was "unique" in the history of the Firm and, thus, is not the type of fee contemplated by or addressed in the Agreement.

¶27 Yet, even assuming, arguendo, that §§ 35-10-106(1) and -401(2), MCA, govern the allocation of the Gallagher fee, the Firm is the party that allegedly failed to comply with these statutory provisions. Thus, as with our resolution of Count I, we conclude that Count II of Phelps's complaint—to the extent that it states a cause of action—is a claim against the Firm, not Frampton. Accordingly, we affirm the District Court's grant of summary judgment in favor of Frampton on the §§ 35-10-106(1) and -401(2), MCA, claim.

### III. The Breach of Oral Contract - Promissory Estoppel Claim

¶28 As noted above, Phelps alleged under Count III that Frampton had orally agreed with Phelps "to share a substantial portion of the fee that he received from [the Gallagher case] with the other Hedman firm partners" and that "Frampton's failure and refusal to pay Phelps a 20% share is a breach of Frampton's oral contract." The District Court concluded that Phelps had failed to establish the existence of an oral contract; thus, the court granted summary judgment in favor of Frampton on this claim. Phelps has not made a specific challenge to this ruling on appeal; we therefore will not address it further.

**IV. The Breach of Covenant of Good Faith and Fair Dealing Claim**

¶29 Under our caselaw, "every contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. City of Bozeman*, 242 Mont. 436, 450, 791 P.2d 767, 775 (1990). "In essence, the covenant is a mutual promise implied in every contract that the parties will deal with each other in good faith, and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Beaverhead Bar Supply v. Harrington*, 247 Mont. 117, 124, 805 P.2d 560, 564 (1991) (citing *Story*, 242 Mont. at 450, 791 P.2d at 775); *cf. Restatement (Second) of Contracts* § 205 cmt. a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . .").

¶30 In addition, Montana's Uniform Partnership Act (Title 35, Chapter 10, MCA) imposes an "obligation of good faith and fair dealing" on partners. Specifically, § 35-10-405(5), MCA, states, in pertinent part, that "[a] partner shall discharge the duties to the partnership and the other partners under this chapter or under the partnership agreement and exercise any rights consistent with the obligation of good faith and fair dealing." This obligation is neither a fiduciary duty arising out of the partners' special relationship nor a separate and independent obligation; rather, it is "an ancillary obligation" that is dependent on the existence of another duty or a right arising under the partnership agreement or Title 35, Chapter 10, MCA. *See* Unif. Partn. Act § 404 cmt. 4 (1992 with

14

1993 Proposed Revisions); *see also* Unif. Partn. Act § 404 cmt. 4, 6 U.L.A. 145 (1997).[1]

In other words, the obligation attaches to a partner's discharge of a duty or exercise of a right under the partnership agreement or Title 35, Chapter 10, MCA. Thus, for example, partners have an obligation of good faith and fair dealing in the discharge of their fiduciary duties of loyalty and care (§ 35-10-405(2), (4), MCA) and in the discharge of their duty to furnish complete and accurate information concerning the partnership (§ 35-10-403, MCA). This obligation "may not be eliminated by agreement," § 35-10-405(5), MCA; *accord* § 35-10-106(2)(e), MCA, "but the partners by agreement may determine the standards by which the performance of the obligation is to be measured if the standards are not manifestly unreasonable," § 35-10-405(5), MCA.

¶31     Under Count IV of his complaint, Phelps alleged as follows:

> Montana common law and Section 35-10-405(5), MCA require that a partner discharge his duties to other partners and exercise all partnership rights consistent with the obligation of good faith and fair dealing. Frampton breached the covenant of good faith and fair dealing by claiming and retaining an extraordinarily large sum as his sole property and refusing to pay Phelps his share.

The District Court ruled in favor of Frampton on this claim, reasoning as follows: "Once summary judgment in favor of [Frampton] on the question of an oral contract is determined, [Phelps's] claim under Count IV must also fall to summary judgment. There can be no covenant of good faith and fair dealing in the absence of a contract."

¶32     On appeal, Phelps argues that the District Court erred because "the obligation of good faith and fair dealing exists under both . . . the Uniform Partnership Act and

---

[1] Section 35-10-405(5), MCA, derives from, and is identical in all material respects to, § 404(e) of the Uniform Partnership Act (1992).

Montana common law." First, "[p]artners under Montana law have an obligation of good faith and fair dealing regardless of whether they operate with a written partnership agreement" (citing §§ 35-10-106 and -405, MCA). Second, "Montana common law . . . recognizes the implied covenant [of good faith and fair dealing] in every contract" and "the parties here did have a contract – the partnership agreement."

¶33 Frampton essentially concedes this point, stating that he "agrees with [Phelps] that the district court is not correct that the covenant of good faith and fair dealing does not apply. It does apply to the written agreement and to the partnership relationship." We also agree with Phelps that the implied covenant of good faith and fair dealing and the obligation of good faith and fair dealing both applied here. With respect to the former, it is true that an implied covenant generally does not exist independently of an underlying agreement or a contract. *See Black's Law Dictionary* 391 (Bryan A. Garner ed., 8th ed., West 2004) (defining "covenant" as "[a] formal agreement or promise, usu. in a contract"); *Black's Law Dictionary* 392 (defining "implied covenant" as "[a] covenant that can be inferred from the whole agreement and the conduct of the parties"). Indeed, we have stated that "[the implied covenant of good faith and fair dealing] does not attach in the absence of an enforceable agreement." *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, ¶ 15, 326 Mont. 236, ¶ 15, 108 P.3d 507, ¶ 15; *see also Beaverhead Bar Supply*, 247 Mont. at 124, 805 P.2d at 564 ("In order . . . to recover . . . on a theory of breach of the implied covenant, there must be an enforceable contract to which the covenant attends."); *McNeil v. Currie*, 253 Mont. 9, 14, 830 P.2d 1241, 1244 (1992) (same); *Cate v. First Bank (N.A.)—Billings*, 262 Mont. 429, 432-33, 865 P.2d 277, 279 (1993) (same).

Thus, the District Court was not incorrect in its statement that "[t]here can be no covenant of good faith and fair dealing in the absence of a contract." Here, however, there was a contract—namely, the Agreement—and, as noted above, "every contract, regardless of type, contains an implied covenant of good faith and fair dealing," *Story*, 242 Mont. at 450, 791 P.2d at 775.

¶34 Moreover, irrespective of the implied covenant of good faith and fair dealing in the Agreement, Frampton was required by § 35-10-405(5), MCA, to discharge his duties to the partnership and the other partners under Title 35, Chapter 10, MCA, and under the Agreement and to exercise any rights consistently with the obligation of good faith and fair dealing. Although this was not a separate and independent obligation, it was an ancillary obligation that applied whenever Frampton discharged his duties or exercised his rights. For these reasons, the District Court erred in concluding that a good faith and fair dealing requirement did not exist between Phelps and Frampton.

¶35 That said, Frampton maintains that the District Court ultimately reached the correct result under Count IV. He first posits that "if Frampton simply followed the provisions of the written Partnership Agreement, there can be no breach of the implied covenant of good faith and fair dealing."[2] We reject this contention outright. In *Story*,

---

[2] We note here that Frampton does not provide a separate analysis of the statutory obligation of good faith and fair dealing. Rather, he appears to be of the view that the implied covenant of good faith and fair dealing and § 35-10-405(5)'s obligation of good faith and fair dealing are coextensive. (Phelps, at times, also lumps the two together.) As will become clear below, Frampton's liability under both the implied covenant and the statutory obligation may be resolved on identical grounds; nevertheless, it is important to recognize that they are independent of each other. As explained above, the implied covenant is contract-based and, therefore, applies to the performance and enforcement of

we held that "breach of an express contractual term is not a prerequisite to breach of the implied covenant [of good faith and fair dealing]." *Story*, 242 Mont. at 450, 791 P.2d at 775; *accord Farris v. Hutchinson*, 254 Mont. 334, 337, 838 P.2d 374, 375 (1992) ("[A] breach of the underlying contract is not a prerequisite to a breach of the implied covenant of good faith and fair dealing."). Thus, even if Frampton did not breach any provisions of the Agreement, he still could have breached the implied covenant of good faith and fair dealing. Moreover, irrespective of the implied covenant and the Agreement, Frampton was required by § 35-10-405(5), MCA, to discharge his duties to the partnership and the other partners under Title 35, Chapter 10, MCA, and exercise any rights consistently with the obligation of good faith and fair dealing. Accordingly, we disagree with Frampton's suggestion that he cannot be liable under Count IV if he "simply followed the provisions of the written Partnership Agreement."

¶36 Alternatively, Frampton directs our attention to the following passage in *Weldon v. Montana Bank*, 268 Mont. 88, 885 P.2d 511 (1994):

> "Without some attempt by one party to '[use] discretion conferred by the contract to act dishonestly or to act outside the accepted commercial practices to deprive the other party of the benefit of the contract,' it is questionable whether any breach of the covenant occurred, even if the conduct amounts to breaches of other common law obligations."

*Weldon*, 268 Mont. at 95, 885 P.2d at 515 (alteration in original) (quoting *Shupak v. New York Life Ins. Co.*, 780 F. Supp. 1328, 1342 (D. Mont. 1991), in turn quoting *Story*, 242

---

an agreement or contract. By contrast, § 35-10-405(5)'s obligation is defined by statute and, pursuant to the language of § 35-10-405(5), MCA, applies to the discharge of duties and the exercise of rights under the partnership agreement *and* under Title 35, Chapter 10, MCA.

Mont. at 450, 791 P.2d at 775). Based on *Weldon*, Frampton asserts that "there has been no evidence of dishonesty on the part of Frampton that would deprive Phelps of a benefit, if any, from the [Agreement]"; thus, Phelps's claim fails.

¶37 Phelps, however, argues that "there are many disputed issues of material fact" on the question of whether Frampton's conduct was consistent with reasonable standards of fair dealing in law partnerships. As one example, Phelps asserts that "Frampton on several occasions told Phelps that the fee from [the Gallagher case] would be shared among all partners. [Citation to Affidavit of John M. Phelps.] That, Frampton stated, is the way partners in a law firm treat one another, as opposed to attorneys who simply share expenses. [Citation to Affidavit of John M. Phelps.]" As another example, Phelps asserts that "Frampton held secret meetings with Hileman about the fee allocation in [the Gallagher case], which resulted in a deal being struck between the two of them (and by extension, Lacosta as Hileman's wife). This was done without any notice to, or participation by the other partners." Likewise, Phelps asserts that after the Gallagher case settled, Frampton and Hileman again "met secretly and decided entirely between themselves how [the Gallagher fee] would be distributed. As previously discussed, they distributed it in a manner not provided for under any provisions in the [Agreement]." In sum, Phelps states that "virtually all of the circumstances relating to the manner in which Frampton dealt with the fee from [the Gallagher case] are relevant to the issue of good faith and fair dealing" and that there are, therefore, genuine issues of material fact "as to whether Frampton acted in a manner consistent with his obligations of good faith and fair dealing as a law partner."

19

¶38 Yet, even if there are genuine issues of material fact on the question of whether Frampton acted in a manner consistent with the obligation and the implied covenant of good faith and fair dealing, Phelps cannot withstand summary judgment on this ground alone. As noted earlier, the implied covenant is a mutual promise that the contracting parties will not attempt, through dishonesty or abuse of discretion in performance, to deprive each other of *the benefits of the contract*. *Beaverhead Bar Supply*, 247 Mont. at 124, 805 P.2d at 564; *see also* Richard A. Lord, *Williston on Contracts* vol. 23 § 63:22, at 506 (4th ed., West 2002) ("The duty embraces, among other things, an implied obligation that neither party shall do anything to injure or destroy the right of the other party to receive *the benefits of the agreement*." (emphasis added)); *Story*, 242 Mont. at 450, 791 P.2d at 775 ("When one party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of *the benefit of the contract*, the contract is breached." (emphasis added)). We have also said that " '[t]he covenant . . . arise[s] out of the justifiable expectations of the parties.' " *O'Bagy v. First Interstate Bank*, 241 Mont. 44, 47, 785 P.2d 190, 192 (1990) (ellipsis and second alteration in original) (quoting *Rowland v. Klies*, 223 Mont. 360, 370, 726 P.2d 310, 317 (1986)); *see also Story*, 242 Mont. at 450, 791 P.2d at 775 ("Each party to a contract has a justified expectation that the other will act in a reasonable manner in its performance or efficient breach."). In a similar vein, we have stated that we measure the nature and extent of the covenant by the parties' "justifiable expectations." *See e.g. Hardy v. Vision Service Plan*, 2005 MT 232, ¶ 13, 328 Mont. 385, ¶ 13, 120 P.3d 402, ¶ 13; *Talley v. Flathead Valley Community College*, 259 Mont. 479, 489, 857 P.2d 701, 707 (1993).

¶39    Thus, to maintain a claim for breach of the implied covenant of good faith and fair dealing, it is insufficient to present evidence that the other party acted in bad faith, e.g., by holding "secret meetings" or breaking promises. The claimant must also come forward with evidence sufficient to support the conclusion that as a result of the other party's action, the claimant was deprived of a benefit or a justified expectation under the contract. Whether the claimant's expectation was justified depends on the various circumstances that surround the parties' relationship and thereby shape or give contour to the expectation in the first instance. *See Williston on Contracts* § 63:22, at 514.

¶40    These same principles apply to the obligation of good faith and fair dealing imposed on partners by § 35-10-405(5), MCA. In other words, to withstand summary judgment on a claim for breach of the obligation, the aggrieved partner must come forward with evidence sufficient to support the conclusions (1) that the other partner discharged a duty or exercised a right under the partnership agreement or Title 35, Chapter 10, MCA, inconsistently with the obligation of good faith and fair dealing *and* (2) that, as a result of this action, the aggrieved partner was deprived of a benefit or a justified expectation created by the partnership agreement or Title 35, Chapter 10, MCA.

¶41    Accordingly, as Frampton has suggested, it was necessary for Phelps, in resisting Frampton's motion for summary judgment, to come forward with evidence sufficient to support the conclusion that as a result of Frampton's alleged bad-faith conduct and violation of his duties under the Agreement or under the law, he (Phelps) was deprived of a benefit or a justified expectation created by the Agreement or Title 35, Chapter 10, MCA. In this regard, Phelps's specific theory under Count IV is as follows: "Frampton

21

breached the covenant of good faith and fair dealing by claiming and retaining an extraordinarily large sum as his sole property and refusing to pay Phelps his share." Therefore, we must determine whether Phelps has demonstrated that he, in fact, was entitled to a share of the Gallagher fee.

¶42 The first question is whether the Agreement controlled the allocation of the Gallagher fee. Frampton relies on portions of Hedman's, Hileman's, and Lacosta's depositions, as well as the language of the Agreement itself, for the proposition that the Agreement did, in fact, control the allocation of the Gallagher fee. The language of the Agreement—in particular, the provisions governing partnership draws and shared work on contingent-fee cases—supports Frampton on this point. As described above, the Agreement provides that when two or more partners work together on a contingent-fee case, "[e]ach partner is entitled to receive part of a fee earned based upon . . . a pre-determined percentage split" (as in the Gallagher case). The Agreement also provides that "each partner will keep 50% . . . of the monthly fees paid and properly credited as his/her own" for the first $200,000 of gross income in a calendar year, and that a partner is "entitled to keep 100% of the fees paid and properly credited as his/her own in excess of $200,000 for said year."

¶43 Phelps, however, insists that the Agreement did *not* apply to the Gallagher fee. As support, he presents a jumbled collection of arguments and factual assertions, in which we perceive the following two theories: (1) the pertinent terms of the Agreement are ambiguous, thus requiring a factual determination as to the partners' intent, and (2) the

Gallagher fee was not the type of fee contemplated by or addressed in the Agreement, thus requiring resort to § 35-10-401(2), MCA. We will address these theories in turn.

¶44 First, Phelps contends that the Agreement is ambiguous because it "provides no guidance" as to how to determine whether a particular fee is "properly credited as [the partner's] own" and it does not define the term "earned." We recently set forth the relevant law with respect to alleged contractual ambiguities in *Mary J. Baker Revoc. Trust v. Cenex Harvest*, 2007 MT 159, 338 Mont. 41, 164 P.3d 851:

> [W]hether an ambiguity exists in a contract is a question of law. If the language of a contract is unambiguous—i.e., reasonably susceptible to only one construction—the duty of the court is to apply the language as written. However, if the language of a contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract.
>
> The determination of whether an ambiguity exists in a contract is to be made on an objective basis. Thus, a conclusion of ambiguity is not compelled by the fact that the parties to a document, or their attorneys, have or suggest opposing interpretations of a contract, or even disagree as to whether the contract is reasonably open to just one interpretation. Rather, an ambiguity exists only if the language is susceptible to at least two reasonable but conflicting meanings.

*Baker Trust*, ¶¶ 19-20 (citations and internal quotation marks omitted).

¶45 Here, Phelps has failed to establish that the terms "properly credited as [the partner's] own" and "earned" are each susceptible to at least two reasonable but conflicting meanings. He references deposition testimony by Hedman, Hileman, and Lacosta regarding their individual understandings of the term "earned," and he provides a dictionary definition of the term "earn," from which he argues that "Frampton did not 'earn' a fee in excess of $900,000 by serving as local counsel, under any understanding of the term" and, thus, that "Frampton could not properly consider [the fee] 'his own'

23

under the terms of the partnership agreement." Yet, as just stated, an ambiguity does not exist in a contract simply because the parties to the document, or their attorneys, have or suggest opposing interpretations of the language contained therein. *See Baker Trust*, ¶ 20. At bottom, Phelps's theory of ambiguity appears to be simply that, in his personal view, the terms "properly credited as [the partner's] own" and "earned" do not apply to the Gallagher fee. Ambiguity, however, "does not exist just because a claimant says so." *Holmstrom v. Mutual Benefit Health & Accident Ass'n*, 139 Mont. 426, 428, 364 P.2d 1065, 1066 (1961). Accordingly, we hold that Phelps has failed to establish that these terms are ambiguous.

¶46 Second, with respect to Phelps's theory that the Gallagher fee was not the type of fee contemplated by or addressed in the Agreement, Phelps presents an extensive argument, well-supported by the record, that the Gallagher case, the circumstances under which Frampton became involved with the case, the manner in which the case was handled, and the size of the fee received were "unique" in the Firm's history. From this, Phelps posits that the Agreement did not provide for how the Gallagher fee should be allocated; in other words, in Phelps's view, the Agreement covered only "run-of-the-mill" or "garden-variety" cases and fees. Yet, Phelps cites nothing in the Agreement itself that supports his position. As Frampton points out, the Agreement recognized hourly fees and contingent fees; thus, it appears that Phelps would have us read into the Agreement an exclusion of fees in "unique" contingent-fee cases. This we may not do. *See* § 1-4-101, MCA ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to

24

insert what has been omitted or to omit what has been inserted."). Moreover, Phelps's position is undermined by his own deposition testimony, which reflects that in late 2000 or early 2001, he proposed to the other partners that they adopt a different method of sharing fees in "large" cases—including the Gallagher case—but this proposal was never adopted.

¶47 Our review of the record convinces us that Phelps's position here, as with his ambiguity argument, is based on his personal view that the Agreement does not contemplate or address the Gallagher fee. Phelps has offered no legal authority, no expert testimony, and no witnesses (aside from himself) supporting his interpretation of the Agreement. We therefore hold, based on Frampton's showing and Phelps's failure to overcome that showing, that the Agreement controlled the allocation of the Gallagher fee.

¶48 The second question is whether the Gallagher fee was correctly allocated pursuant to the terms of the Agreement. It is undisputed that the Gallagher case was a contingent-fee case and that Frampton and Hileman entered into an agreement which established a predetermined percentage split of the Gallagher fee. Phelps contends, however, that there is a factual question as to whether Frampton actually "earned" any of the Gallagher fee and, thus, whether the 55% share of that fee was "properly credited as [Frampton's] own." In this regard, Phelps acknowledges that Frampton did do some work on the Gallagher case, but he contends that "virtually all" of the work was handled by the Georgia firm and the other Montana firm. Yet, Phelps offers no basis in the Agreement for concluding that partners (such as himself) who indisputably perform *no* substantive work on a particular contingent-fee case are nevertheless entitled to shares of the

contingency fee if the partners who *do* perform substantive work on the case just don't do enough work. Moreover, Phelps offers nothing more than his own opinion that Frampton's work on the Gallagher case was so minimal that it does not qualify as "earn[ing]" any of the Gallagher fee.

¶49 Phelps also asserts that he "played a key role in preserving and maintaining [the Firm's] relationship with the City of Whitefish," that "Frampton knew V.M. and [Judge Johnson] by virtue of his affiliation with [the Firm]," and that "but for Frampton's relationship with [the Firm], neither the City Judge nor V.M. would have thought to get him involved in [the Gallagher case]." However, Phelps has not demonstrated that his role, if any, in the origination of the Gallagher case has any bearing here. Again, the Agreement provides that when two or more partners "work together" on a contingent-fee case, "[e]ach partner is entitled to receive part of a fee earned based upon (1) each partner's percentage of the total time spent on the case, or (2) a pre-determined percentage split which shall take into consideration such factors as origination of the case/client, etc." Here, it is undisputed that Phelps did not "work" on the Gallagher case; thus, the above-quoted provision of the Agreement did not entitle him to a percentage of the fee for any role he may have had in the "origination of the case/client."

¶50 But to the extent that the Agreement can be read to ensure compensation to all partners who contribute to the origination of a case/client, the record reflects that Johnson had what he termed a "chance meeting" with Frampton outside Johnson's office about a week after the May 26, 2000 accident and that Johnson thereafter recommended to V.M. that she contact Frampton. The record further reflects that Johnson referred V.M. to

26

Frampton individually, since V.M. "did not like some of the other members of [the Firm]." Indeed, V.M. stated in her affidavit that she brought the Gallagher case to Frampton and considered him to be her attorney. In Phelps's view, it seems, Frampton's presence outside Johnson's office in late May or early June of 2000 and Johnson's referral of V.M. to Frampton would not have occurred "but for" Frampton's relationship with the Firm and Phelps's "key role" in preserving and maintaining the Firm's relationship with the City of Whitefish. However, Phelps offers no legal or factual support for this broad interpretation of the term "origination," which would permit relatively attenuated actions on Phelps's part to constitute "origination." Certainly, if Phelps had presented concrete evidence that Johnson would not have referred V.M. to Frampton, or that V.M. would not have brought the Gallagher case to Frampton, but for the Firm's relationship with the City of Whitefish, then this would be a different case. As it is, however, Phelps has come forward with only speculation.

¶51   For the foregoing reasons, we agree with Frampton and the District Court that the Agreement controlled the allocation of the Gallagher fee, that the Gallagher fee was a "fee earned" by Frampton and Hileman, and that 55% of the Gallagher fee was "properly credited as [Frampton's] own." Phelps has not presented substantial evidence demonstrating the existence of a genuine issue of material fact as to any of these points. Accordingly, we conclude, based on the record before this Court, that Phelps was not entitled to a share of the Gallagher fee and that any expectation he had of receiving such a share was not justified.

¶52 Phelps has not alleged any other benefit or justified expectation which he should have received pursuant to the Agreement or Title 35, Chapter 10, MCA, but which he did not receive because of bad faith or unfair dealing on the part of Frampton surrounding the allocation of the Gallagher fee. Thus, irrespective of whether Frampton actually engaged in such conduct as Phelps alleges, Phelps has failed to make the requisite showing that he was deprived of a benefit or a justified expectation as a result of that conduct. For this reason, his Breach of Covenant of Good Faith and Fair Dealing claim fails.

¶53 In sum, the District Court erred in concluding that a good faith and fair dealing requirement did not exist between Phelps and Frampton; however, the court ultimately reached the correct result on Count IV. We affirm a district court decision that is correct, regardless of the court's reasoning in reaching that decision. *Clark v. Eagle Systems, Inc.*, 279 Mont. 279, 286, 927 P.2d 995, 999 (1996). Accordingly, we affirm the District Court's grant of summary judgment in favor of Frampton on Phelps's Breach of Covenant of Good Faith and Fair Dealing claim.

**V.    The Breach of Fiduciary Duty Claim**

¶54 Under Count V, Phelps alleged that

> Montana common law and Section 35-10-405(2), MCA provides that Frampton owes a fiduciary duty to Phelps in connection with his appropriation of partnership property or opportunity. Frampton breached this fiduciary duty of loyalty by claiming and retaining an extraordinarily large sum as his sole property and refusing to pay Phelps his share.

The District Court disposed of this claim as follows: "[A]s the Court has determined above that the allocation of the *Gallagher* fee comported with the Partnership Agreement,

28

there is no evidence that [Phelps] can bring forward to raise a question of material fact that Frampton violated any provisions of the duty of loyalty to his partners."

¶55 On appeal, Phelps argues that the District Court erred because "there are many disputed issues of fact concerning whether Frampton 'earned' over $900,000 by his limited work on [the Gallagher case], and whether he properly took the fee [as] 'his own.'" We rejected these same contentions in the context of our discussion of Phelps's Breach of Covenant of Good Faith and Fair Dealing claim (Count IV), and we do so here as well for the same reasons (*see* ¶¶ 45, 48, *supra*).

¶56 Phelps also argues that the Gallagher case "was a partnership opportunity" and that the Gallagher fee "was not to be appropriated 'without the consent of the other partners'" (quoting § 35-10-405(2)(a)(iii), MCA). However, the record reflects that the partners in fact did provide "consent" in the form of the Partnership Draws and the Shared Work provisions of the Agreement, which together authorized the Gallagher fee to be allocated as it was—55% to Frampton and 45% to Hileman. The record also reflects that Frampton contributed to the partnership pool up to the required $100,000 annual cap and, thus, did not retain funds to which the Firm was entitled.

¶57 Finally, Phelps again makes references to "secret meetings" supposedly had by Frampton and Hileman regarding the allocation of the Gallagher fee. In his deposition, Phelps explained that in his view,

> this case should have been discussed at the outset by the firm as -- as to a division of fees, as to determining who brought it in, who didn't bring it in, what's appropriate, what's fair, and that didn't happen. And I think that should have happened. I think that's a breach of fiduciary duty . . . .

29

Yet, Phelps has cited no provision of the Agreement requiring the Firm to determine or approve the percentage splits for partners who work together on contingent-fee cases. Moreover, Phelps admitted in his deposition that Frampton "[f]airly contemporaneously" provided Phelps with information about Frampton and Hileman's fee agreement. Phelps's conclusory allegations concerning "secret meetings" are insufficient to establish a genuine issue of material fact. *See Klock v. Town of Cascade*, 284 Mont. 167, 174, 943 P.2d 1262, 1266 (1997) ("In order to meet its burden, the party opposing the [summary judgment] motion must present substantial evidence, not mere denial, speculation, or conclusory statements.").

¶58 Accordingly, we affirm the District Court's grant of summary judgment in favor of Frampton on Phelps's Breach of Fiduciary Duty claim.

## VI. The Constructive Trust Claim

¶59 Lastly, Phelps alleged under Count VI that "Frampton derived property or benefit by appropriation of partnership property or opportunity" and that "Frampton would . . . be unjustly enriched if he were permitted to retain the extraordinarily large sum that he took as his sole property." Thus, "[a] constructive trust should be imposed on the fee to insure that Phelps receive [sic] a 20% share of it." The District Court ruled against Phelps on this claim, reasoning that "it is inappropriate to impose a constructive trust" since "the Partnership Agreement dictates the nature of the fee distribution," "Frampton correctly retained his percentage of the fee," and, thus, "there can be no question that any part of the fee belonged to Phelps."

¶60   On appeal, the crux of Phelps's challenge to the District Court's ruling is that "[the Gallagher fee] was not properly the sole property of Frampton and/or Hileman." Phelps requests that we impose "a constructive trust on an equitable portion of the fees improperly taken by Frampton as his own in [the Gallagher case]." Yet, we concluded above that Frampton was entitled to 55% of the Gallagher fee, and the record reflects that he contributed to the partnership pool as required by the Agreement. Phelps has failed to demonstrate that Frampton would be unjustly enriched if he were permitted to retain the remaining portion of his 55% share of the Gallagher fee. *See In re Marriage of Moss*, 1999 MT 62, ¶ 29, 293 Mont. 500, ¶ 29, 977 P.2d 322, ¶ 29 ("[A] person seeking to impose a constructive trust on property must . . . prove that the title holder would be unjustly enriched if they were permitted to retain title."); *see also* § 72-33-219, MCA ("A constructive trust arises when a person holding title to property is subject to an equitable duty to convey it to another on the ground that the person holding title would be unjustly enriched if he were permitted to retain it."). We conclude, therefore, that there is no basis here for imposing a constructive trust, and we affirm the District Court's grant of summary judgment in favor of Frampton on Phelps's Constructive Trust claim.

## CONCLUSION

¶61   The District Court did not err in granting summary judgment in favor of Frampton on each of the claims set forth in Phelps's complaint.

¶62   Affirmed.

/S/ JAMES C. NELSON

31

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE