DA 11-0420

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 77

ROBERT HURLY, INDIVIDUALLY AND AS TRUSTEE
OF THE ROBERT HURLY TRUST; DIRK HURLY;
IRENE JONES; and CANDANCE KREWER,

      Plaintiffs and Appellants,

  v.

LAKE CABIN DEVELOPMENT, LLC, and BOB BOWDEN,

      Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eleventh Judicial District, In and For the County of Flathead, Cause No. DV 06-906B Honorable Katherine R. Curtis, Presiding Judge |

COUNSEL OF RECORD:

      For Appellants:

            Robert W. Hurly, Attorney at Law; Glasgow, Montana

            Matthew W. Knierim; Christoffersen & Knierim, P.C.; Glasgow, Montana

      For Appellees:

            Judah M. Gersh; Viscomi & Gersh; Whitefish, Montana

            Alan Jay Lerner; Lerner Law Firm; Kalispell, Montana

                         Submitted on Briefs:  January 25, 2012

                                   Decided:  April 10, 2012

Filed:

                           _____

                                   Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Appellants Robert Hurly, Dirk Hurly, Irene Jones, and Candace Krewer (collectively the "Robert Hurly family") appeal the Eleventh Judicial District Court's judgment in favor of Lake Cabin Development, LLC (Lake Cabin). Appellants raise the following issues:

¶2 **1. Whether the District Court erred in determining there was no enforceable contract between the parties.**

¶3 **2. Whether Lake Cabin is entitled to a refund of its $250,000 option payment.**

¶4 **3. Whether the District Court erred in awarding Lake Cabin's attorney's fees.**

¶5 We reverse the District Court's legal determination that the parties had not entered a binding agreement. Interpreting the language of that agreement, we hold that Lake Cabin is not entitled to a refund of the option payment and we accordingly reverse on all issues.

## PROCEDURAL AND FACTUAL BACKGROUND

¶6 Brothers John and Robert Hurly owned adjoining property with residences near Whitefish Lake. Lake Cabin is a company formed between Bob Bowden and Bayard Dominick for the purpose of real estate acquisition in Whitefish, Montana. In early 2005, Lake Cabin initiated negotiations with several landowners residing near Whitefish Lake to purchase their property as part of a development scheme to divide the land into numerous parcels and construct residences on each for sale. Prior to beginning discussions with the Hurlys, Lake Cabin already had purchased approximately 37 acres of vacant land for the project.

2

¶7      In August 2005, Lake Cabin entered into two separate written agreements with the Robert Hurly family and the John Hurly family to purchase their respective properties. The agreements referred to the property owned by the Robert Hurly family as "Tract 2H" and the property owned by the John Hurly family as "Tract 2K." The Robert Hurly family agreement contained the following language:

> The total purchase price for Tract 2H shall be the following:
>
> FOUR HUNDRED FIFTY THOUSAND DOLLARS ($450,000.00) cash. The residence on the property is owned by Robert Hurly Trustee alone and is valued at $500,000, and cash paid is payment for the residence;
>
> The sum of $250,000 is payable within 30 days as non-refundable option money to be applied to the purchase if Buyer goes ahead with the purchase. Both the $250,000 nonrefundable option money and the $200,000 cash at closing is to be payable to Robert Hurly only.
>
> .    .    .
>
> ***On the Development Lot, Buyer shall construct for Seller, provided the necessary approvals can be obtained from the City of Whitefish, the following:***
>
> ***Two single family homes with two car attached garages;***
> Two duplex rental houses (for a total of four units); and
> The dock for which a permit has been obtained from the City of Whitefish for the Development Lot.
>
> .    .    .
>
> This transaction shall be contingent on Buyer having a thirty (30) day due diligence period. ***If Buyer is not satisfied with its investigation of the property, or the financing it is able to obtain for the purchase, during the due diligence period then Buyer may declare this Agreement null and void and Seller may keep the $250,000 non-refundable option money.***
>
> .    .    .
>
> The two duplex rental houses proposed to be built on the Development Lot will be two bedroom, one bathroom units.
>
> The Townhouse will have a total of 4 bedrooms and 3.5 bathrooms. Final floor plan and specifications will be agreed upon by August 25, 2005.
> . . . [Emphases added].

3

¶8 Pursuant to the Tract 2H agreement, Lake Cabin provided Robert Hurly with a check for $250,000. The agreement stated a closing date of January 5, 2006. After the parties signed their respective agreements, Lake Cabin applied for Planned Unit Development (PUD) approval from the City of Whitefish so it could begin the project. Lake Cabin submitted all reports the City requested and fully cooperated with City staff. In October 2005, the City-County Planning Board held a public meeting in which Lake Cabin's application was addressed. During that meeting, the public voiced strong opposition to the plan regarding the density of the development, the impact on traffic, the effects it would have on the wildlife and wetlands in the area, and hydrology concerns. In response, Lake Cabin filed an amended PUD application in which it reduced the number of units it would build and also hired a wildlife expert, a traffic engineer, and two hydrology experts to assist in addressing the public's additional concerns.

¶9 A second public hearing was held on November 17, 2005. Despite Lake Cabin's efforts, the public opposition was even stronger and more organized. Several members of the Planning Board indicated they would not approve the PUD if Lake Cabin insisted on a vote. Lake Cabin agreed to continue the hearing in order to address the concerns of the Planning Board, City staff, and members of the public.

¶10 On December 28, 2005, Bowden contacted the Hurlys to inform them of the difficulties he was facing with the PUD approval and to ask for an extension on the closing date of their agreement. Bowden further advised that he would be withdrawing the present application and revising the plans to attempt to gain approval. The Hurlys

4

agreed to extend the deadline until August 31, 2006, and Lake Cabin continued its efforts with the Planning Board.

¶11    In April 2006, the City enacted an emergency storm water management ordinance that placed a six-month moratorium on PUD applications. The ordinance was later extended for eighteen months. Ultimately, Lake Cabin did not re-apply for PUD approval due to the unfavorable recommendations from City staff, the perception that it would not receive a favorable vote from the Planning Board and City Council, and the effects of the emergency ordinance. Nonetheless, Lake Cabin and Robert Hurly continued to work toward closing their transaction.

¶12    On August 11, 2006, Robert Hurly sent a letter to Lake Cabin's architect, Theodore Guy, commenting on his draft plans for the structures Lake Cabin was to build for the Robert Hurly family. The numerous suggestions included bay windows for the bathrooms and kitchen, an additional room upstairs instead of vaulted ceilings, unbreakable glass on the main level, and an outdoor cooking area. Bowden responded on October 3, 2006, stating:

> I have also reviewed your design comments on the two risher [sic] houses which I am attaching with my comments. I must say that after reviewing your comments, you should be on my payroll. Many good ideas. I am forwarding these comments to the architect and can assure you that costs are climbing, which I will need to factor into our final closings. But I am still very buoyed by our efforts and believe we can get this deal done to everyone's benefit.

Bowden hand-wrote comments on each request made in the letter in the left and right margins. In the left column Bowden wrote "ok", "good idea", or "good point" beside nearly every one of Hurly's comments. The right margin comments were intended for

5

Guy and asked for feedback on the feasibility of some of Hurly's requests, for an assessment on cost impacts of various proposals, and for suggestions on how to "make this happen." At trial, Bowden stated he did not provide any further response to Hurly regarding his design comments.

¶13 On October 17, 2006, Bowden's attorney, Richard Cummins, wrote an email to Janet White, John Hurly's daughter, and requested she forward it to Robert as well. It stated:

> I regret that we were unable to work things out relative to the purchase of Tracts 2H and 2K . . . ***Unfortunately, the town is apparently in a posture where growth is not welcomed and Bob's submission was not going to be acceptable to town council*** . . .
>
> Bob wanted to follow through with you and not pull the plug on the deal but the development realities necessitated a new deal which recognized that we were simply not going to be able to do what we had all contemplated . . .
>
> Accordingly, Buyer declares the contract to be null and void and demands the return of all earnest monies. . . . Buyer would be unable to deliver a two bedroom condominium as required by the August 2005 addendum ***due to the actions taken by the City.*** Obviously, neither party attempted to close on Aug. 31, 2006 as required pursuant to the second addendum since we were all trying to structure an agreement that would address the failure to obtain approvals from the City. There are other deadlines that were not met, however, for purposes of this letter, I am simply addressing the obvious two points referenced above and reiterating the dilemma all of us found ourselves in ***because of the actions taken by the City***. [Emphases added.]

Both Hurly families subsequently brought separate breach of contract actions in district court. The dispute regarding the John Hurly family agreement has since settled and is not subject to this appeal. The Robert Hurly family complaint sought specific performance of the contract, attorney's fees, and costs for the litigation. It did not request damages.

6

After a three-day bench trial, the District Court concluded that Robert Hurly was required to refund the $250,000 option payment plus interest to Lake Cabin because there was never an enforceable contract between the parties. The court further held that the Robert Hurly family breached the implied covenant of good faith and fair dealing by seeking changes to the real estate structures which were inconsistent with the minimal parameters outlined in the agreement. Finally, the District Court awarded Lake Cabin its attorney's fees based on a provision in the agreement entitling the prevailing party to receive them. The Robert Hurly family timely appealed.

## STANDARD OF REVIEW

¶14 Both the existence of a contract and its interpretation are questions of law which we review for correctness. *Murphy v. Home Depot*, 2012 MT 23, ¶ 6, 364 Mont. 27, 270 P.3d 72 (citing *Lockhead v. Weinstein*, 2003 MT 360, ¶ 7, 319 Mont. 62, 81 P.3d 1284); *Summer Night Oil Co., LLC v. Munoz*, 2011 MT 202, ¶ 19, 361 Mont. 424, 259 P.3d 778. This Court reviews a trial court's factual findings for clear error. *Tungsten Holdings, Inc. v. Olson*, 2002 MT 158, ¶ 13, 310 Mont. 374, 50 P.3d 1086. We first review for correctness whether legal authority exists to award attorney's fees; if it does, we review a district court's order granting or denying attorney's fees for an abuse of discretion. *Hughes v. Ahlgren*, 2011 MT 189, ¶ 10, 361 Mont. 319, 258 P.3d 439.

DISCUSSION

**¶15   1. Whether the District Court erred in determining there was no enforceable contract between the parties.**

¶16   Lake Cabin argues no valid contract existed with the Robert Hurly family because the parties never agreed to specifications of the real estate improvements to be constructed on the property. Lake Cabin also asserts that, because the proposed recommendations by the family could have increased the cost of the structures by up to $400,000, the parties never agreed to a purchase price. We disagree.

¶17   "A contract must contain all its essential terms in order to be binding." *Findley v. Mont. Thirteenth Jud. Dist. Ct.*, 277 Mont. 242, 247, 921 P.2d 870, 873 (1996). The essential elements of a contract are "(1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration." Section 28-2-102, MCA. We have indicated that essential terms encompass "critical issues" as opposed to "mere details." *Zier v. Lewis*, 2009 MT 266, ¶ 23, 352 Mont. 76, 218 P.3d 465.

¶18   In support of its position, Lake Cabin cites *GRB Farm v. Christman Ranch, Inc.*, 2005 MT 59, 326 Mont. 236, 108 P.3d 507. We held in that case that "[a]n agreement that requires the parties to agree to material terms in the future is not an enforceable agreement[.]" *GRB Farm*, ¶ 11. There, the agreement gave GRB Farm an option to negotiate a renewal of a lease at some time in the future: "[a]fter October 1, 2002, Lessee shall have the option to negotiate an extension of the lease for years subsequent to the year 2002, upon such terms and conditions as Lessor and Lessee shall agree to at that

time." *GRB Farm*, ¶ 3. Christman later approached GRB Farm with an opportunity to purchase the property, but GRB refused. *GRB Farm*, ¶ 4. When Christman subsequently entered a purchase agreement with another party, GRB Farm sued for breach of contract. *GRB Farm*, ¶ 5. We held the agreement was unenforceable because "[t]he parties agreed only to contemplate negotiating an extension of the lease for some indeterminate period of time and for some unspecified amount." *GRB Farm*, ¶ 12.

¶19　We also have held that an option to renew a lease failed to include necessary material terms where it stated "the amount of rental shall be subject to negotiation and mutual agreement between the parties." *Riis v. Day*, 188 Mont. 253, 254, 613 P.2d 696, 697 (1980). Although we determined the renewal was not enforceable in that case, we rejected the notion that it "must specify the time the lease is to extend and the rate of rent to be paid with such certainty that nothing is left for future determination." *Riis*, 188 Mont. at 255-56, 613 P.2d at 697. Instead, we adopted a "minority view," under which "a renewal provision will be enforced if it expressly contemplates a clear and definite mode for determining future rent." *Riis*, 188 Mont. at 256, 613 P.3d at 697-98.

¶20　*GRB Farm* and *Riis* are distinguishable from the present case. Here, the parties signed an agreement providing that Robert Hurly would sell his property to Lake Cabin in exchange for certain and specified cash payments, including the non-refundable option payment, and additional structures. In regard to those structures, the contract stated:

> The single family homes that are proposed to be built on the Development Lot shall be approximately 2,500 square feet each, contain 4 bedrooms and 2.5 bathrooms each, the ground floor and ground floor master bathroom will be ADA accessible, they will have two-car attached garages, one house will have the family room enclosed, and Buyer and its architect will meet

9

with Seller to modify the floor plans to the satisfaction of Seller, ***which shall be agreed upon by August 25, 2005.*** Buyer will seek approval from the City of Whitefish to split the Development Lot into two lots with fifty feet of lakefront each, or develop condominiums such that Seller can have separately deeded interests in the property. The Seller that takes title to the Development Lot will have access to the amenities of Lake Cabin development, and will not have to pay any dues or fees to the homeowners association or club for their lifetime as long as they continue to own the Development Lot.

The two duplex rental houses proposed to be built on the Development Lot will be two bedroom, one bathroom units.

The Townhouse will have a total of 4 bedrooms and 3.5 bathrooms. ***Final floor plan and specifications will be agreed upon by August 25, 2005.*** [Emphases added.]

¶21 Although the parties stipulated that they would later determine the floor plans for these structures, there was sufficient information provided in the contract to make the parties' obligations "clearly ascertainable." *GRB Farm*, ¶ 11. The fact that the parties provided for general plans in the contract but left the specifications to be settled later indicates their understanding that these additional terms were not material. The agreement made explicit that the floor plans would be settled by a certain date and would act to modify the contract:

This Agreement shall constitute the entire agreement between Seller and Buyer, except for the plans and specifications for the construction of the structures on the Development Lot and the Townhouse. This Agreement can be modified only in writing, signed by the Seller and Buyer, and shall be deemed to be modified by the signatures on the plans and specifications that will be agreed upon between Buyer and Seller for the Townhouse and structures to be built on the Development Lot.

While the parties ultimately failed to agree to the final floor plans by the date specified, they continued to negotiate the terms pursuant to the agreement. The reason the deal did

10

not close on the date specified in the agreement was that Lake Cabin experienced difficulty in gaining PUD approval and asked for an extension; however, the District Court found this was not a condition to performance under the Robert Hurly family contract:

> The John Hurly family purchase agreement with Lake Cabins provided that Lake Cabins could terminate the agreement and obtain the return of its earnest money payment 'until Buyer has obtained satisfactory PUD approval from the City of Whitefish.' The Robert Hurly family agreement did not contain such a contingency.

No party has challenged the trial court's finding on this point.

¶22 We do not agree that the parties failed to assent to terms sufficient to support creation of a contract. As stated above, Montana law requires the contract to contain "sufficient cause or consideration." Section 28-2-102, MCA. Here, the agreement stated that the $450,000 cash payment was in consideration for the residence currently on the Robert Hurly family property. The agreement provided further specifications for the houses to be constructed, including square footage, the number of bedrooms, the number of bathrooms, portions of the house that would be ADA accessible, and that the houses would include two-car garages, and it provided a date certain by which the plans would be finalized. This outline was adequate to provide a distinct baseline for the additional consideration Lake Cabin would tender to the Hurlys pursuant to the contract. In contrast to *Riis*, there were clear and definite parameters for determining the purchase price. The agreement included all essential material terms and thus constituted a binding and enforceable contract.

11

**¶23    2.  Whether Lake Cabin is entitled to a refund of its $250,000 option payment.**

¶24    The Robert Hurly family argues that if Lake Cabin elected to terminate the agreement after the thirty-day due diligence period, it "was entitled to do so" but that Hurly would then keep the option money.  It adds that Lake Cabin's extension of the closing held the Robert Hurly family to the deal for nearly a year past the date called for in the agreement.  Lake Cabin argues that even if the agreement constituted an enforceable contract, it nonetheless is entitled to a refund of its $250,000 payment because the Robert Hurly family breached the implied covenant of good faith and fair dealing in the contract when Hurly proposed floor plans which could cost as much as $400,000 more than the original designs.  Though the District Court determined there was no enforceable contract, it agreed with Lake Cabins and held that the Robert Hurly family's breach of the implied covenant defeated its claim for specific performance of the contract.  On appeal, the Robert Hurly family has abandoned its demand for specific performance and elected to pursue only the right to retain the option payment.

¶25    "'[I]n order . . . to recover . . . on a theory of breach of the implied covenant, there must be an enforceable contract to which the covenant attends.'" *Knucklehead Land Co. v. Accutitle, Inc.*, 2007 MT 301, ¶ 18, 340 Mont. 62, 172 P.3d 116 (quoting *Phelps v. Frampton*, 2007 MT 263, ¶ 33, 339 Mont. 330, 170 P.3d 474).  The District Court's determination that there was not an enforceable contract should have foreclosed its further inquiry into the claim that the Hurlys breached the implied covenant.  Having determined the contract to be valid, we conclude that the trial court's finding that "Robert Hurly continued to ask for more square footage and other changes to the plans"—while

12

perhaps sufficient to defeat the Hurlys' claim for specific performance—does not resolve the issue of entitlement to the option money under the circumstances of the parties' agreement and its termination. We turn to the contract to make this determination:

Specific Performance and Forfeiture of Option Money: The parties agree that should Seller abide by all the obligations set forth herein and *all conditions or contingencies are either satisfied or waived*, but Buyer refuses to purchase the property, then Seller may either retain Buyer's option money and terminate this Agreement as their sole remedy, or elect to enforce this contract against Buyer by the remedy of specific performance.

*If all the conditions or contingencies provided for in this Agreement are satisfied or waived* and if Seller should refuse to convey title to the property, the parties agree that this Contract authorizes the Buyer as Buyer's remedy to either demand immediate repayment of the option money and upon the return and acceptance of such the rights and duties of the parties under this Agreement shall be terminated or, in the alternative, to enforce this Agreement by the remedy of specific performance and require Seller to convey under the terms and conditions set forth herein, at Buyer's discretion, and/or Buyer may seek any damages caused by Seller's acts or omissions. [Emphases added.]

¶26 The only condition Lake Cabin asserts was not satisfied by the Robert Hurly family was the requirement that the parties agree on specifications for the new structures by August 25, 2005. We first note that the contract never made explicit that such an agreement was either a condition to performance or a contingency. In fact, the contract only provides the following in relation to contingencies: "Contingencies: This agreement is contingent on Buyer's thirty (30) day due diligence period and Buyer's review of the title commitment, as set forth above."

¶27 Based on Lake Cabin's communications with the Hurlys, we conclude that Lake Cabin waived the agreement's only express condition regarding the two structures, which was that the floor plans be settled by August 25, 2005. "[W]aiver is the voluntary and

13

intentional relinquishment of a known right, claim or privilege, which may be proved by express declarations or by a course of acts and conduct which induces the belief that the intent and purpose was waiver." *R.C. Hobbs Enters., LLC v. J.G.L. Distrib.*, 2004 MT 396, ¶ 24, 325 Mont. 277, 104 P.3d 503 (quoting *VanDyke Const. Co. v. Stillwater Mining Co.*, 2003 MT 279, ¶ 15, 317 Mont. 519, 78 P.3d 844).

¶28 The record is devoid of any evidence that Lake Cabin ever attempted to enforce the August 2005 deadline. In fact, in December 2005, Lake Cabin asked Robert Hurly for an extension of the closing date by six months because of the difficulties it was facing in securing a loan as well as City approval. The Robert Hurly family agreed to the extension and provided its proposed plans for the structures in August 2006. Bowden responded favorably to the proposal, stating that "costs were climbing" but not that the suggestions were too late or so excessive as to obviate Lake Cabin's obligation to perform. Rather, Bowden praised the plans' "[m]any good ideas." At no point prior to termination of the agreement did Lake Cabin inform the Robert Hurly family there was a problem with the floor plans. Bowden stated the following at trial:

> MR. KNIERIM: Did you – did Robert Hurly ever tell you that he was not agreeable to making an offset or change in those plans that were listed on that exhibit? Did he ever tell you that?
>
> BOWDEN: Specifically, no.
>
> MR. KNIERIM: All right. And that's because you never got back to him with your response to his proposed changes, did you?
>
> BOWDEN: That's not the only reason, no.
>
> MR. KNIERIM: Well, it's not the only reason – is that a reason? Did you get back to him? No?

BOWDEN: I did not get back to him with the cost of those specific changes.

¶29 Even when Lake Cabin formally terminated the contract in October 2006, it did not do so on the ostensible ground that the Robert Hurly family had failed to satisfy its obligations under the contract. Rather, Cummins's e-mail stated that Bowden was terminating the agreement "***due to the actions taken by the City***." (Emphasis added.) Moreover, Lake Cabin has never argued the Robert Hurly family was unwilling to convey title to its property pursuant to the contract. In fact, the Robert Hurly family initially sought to have the contract specifically performed. The buy-sell agreement contemplated the Robert Hurly family would retain the option money if Lake Cabin exercised its right to declare the agreement null and void for reasons other than the seller's refusal to abide by the terms of the agreement. Since Lake Cabin waived the deadline for the floor plan and specifications and did not terminate the contract on the ground that the Robert Hurly family had failed to satisfy any other condition, the Robert Hurly family was entitled to retain the $250,000 non-refundable option payment.

¶30 **3. Whether the District Court erred in awarding Lake Cabin's attorney's fees.**

¶31 The contract contained a clause allowing attorney's fees to be awarded to the prevailing party in litigation. After concluding that there was no enforceable contract between the parties and that Lake Cabin was entitled to return of the non-refundable option payment, the court awarded Lake Cabin its attorney's fees. Lake Cabin argues that since the District Court awarded it the $250,000 option payment, it was the

15

prevailing party and is entitled to fees.  Since we have reversed that determination, we likewise reverse the fee award against the Robert Hurly family.

¶32    We hold that the agreement between Lake Cabin and the Robert Hurly family constituted an enforceable contract.  While obviously not a model of clarity, it contained all the necessary material terms for sale of the property.  The Robert Hurly family is entitled to retain the $250,000 option payment because Lake Cabin waived the deadline for final agreement on the floor plans and specifications and did not terminate the agreement for the Hurlys' failure to satisfy their obligations.  The District Court's award of attorney's fees to Lake Cabin was predicated on its return of the option payment to Lake Cabin.  Since we have reversed that determination, we also reverse the award of fees.  The case is remanded for entry of judgment in favor of the Appellants in accordance with this opinion.


                                                    /S/ BETH BAKER

We concur:


/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ JIM RICE