JUSTICE WHEAT
delivered the Opinion of the Court.
¶1 Charles Kelly Kluver, Karson Kluver, and Genie Land Company (collectively the “Kluvers”) appeal two orders of the Sixteenth Judicial District Court, Rosebud County; one involving rulings on evidentiary motions, and the other granting a motion to enforce a settlement agreement in favor of PPL Montana, LLC, Puget Sound Energy, Inc., Northwestern Corporation, the Clark Fork and Blackfoot, LLC, the Montana Power Company, LLC, Avista Corporation, Pacificorp, Portland General Electric Company, John Does 1-20, (collectively the “Power Companies”), and Douglas McRae, Kim McRae, and Greenleaf Land and Livestock Company (collectively the “McRaes”). We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶2 The Kluvers and McRaes are neighbors and ranchers in Rosebud County. In February 2007, they commenced a lawsuit against the Power Companies[1] alleging that the Colstrip power facility, which *104 borders land owned by the Kluvers and McRaes, contaminated groundwater under their property. The Kluvers and McRaes were represented by Monte Beck (Beck), John Amsden (Amsden), Jory Ruggiero (Ruggiero) and Brett Engel (Engel). The Power Companies’ counsel included Guy Rogers (Rogers), Thomas Stoever (Stoever), and Stephen Redshaw (Redshaw).
¶3 After over three years of litigation, on July 14, 2010, the parties assembled in Billings to participate in a mediation to see if a negotiated settlement could be reached. Present at the mediation were the mediator, the Kluvers and their wives, Beck, Ruggiero, Engel, Rogers, Stoever, Redshaw, and Gordon Criswell (Criswell), an employee of PPL Montana and a representative for the Power Companies. The McRaes did not attend, but authorized their counsel to proceed with the mediation and agree to a settlement on their behalf. The mediation lasted the entire day, concluding at approximately 10:00 p.m. with the transmission of a Memorandum of Understanding (MOU) as an email from Ruggiero to Rogers and copied to other counsel.
¶4 The relevant portions of the MOU are as follows:
The following terms memorialize the global settlement agreement between all Plaintiffs in this matter ... and all Defendants ...
Defendants shall pay all Plaintiffs [_] dollars.[2]
Plaintiffs shall sign a global release of all defendants ... [that] shall include all past, present and future claims... [that] arise out of the subject matter of this lawsuit....
Within 60 days, Plaintiffs shall convey fee simple title to the following lands to Defendant PPLM:
[Sections 3 and 10 in their entirety, [t]he Southwest 8th of section 33 and all of section 4 that Plaintiffs own. This land is demarcated on the map held by the mediator].
Within 60 days, Defendants and Plaintiffs shall enter into a renewable, ninety-nine (99) year lease whereby Defendants shall lease to Plaintiffs [all land conveyed above and Section Nine]. This lease shall entitle Plaintiffs to make all uses of the surface .... Within 60 days, Defendants and Plaintiffs shall enter into a perpetual first option to purchase whereby Plaintiffs ... shall be entitled to the first right to purchase [all land conveyed above and Section Nine] for the sum of One (1) dollar.
*105 This Memorandum has been reviewed and approved by the parties and their counsel copied herein.
¶5 On the evening of July 14, 2010, Engel called the McRaes and informed them that a settlement had been reached at the mediation. A few days later, Karson Kluver went to the McRaes’ home and expressed relief that the case was over, appreciation that the McRaes participated in the case, and sadness that he would have to part with some of his land as part of the settlement. As a result of this conversation, the McRaes both thought the Kluvers believed the parties reached a settlement at the mediation.
¶6 On July 19, 2010, Ruggiero filed a Notice of Tentative Settlement with the court. During the next few weeks, there were email communications between counsel discussing different aspects of the settlement, primarily those dealing with the real estate transactions and the documentation necessary to complete them. In some of these emails the MOU was referred to as a “draft.”
¶7 A few weeks after the mediation, Doug McRae and the Kluvers had a conversation at a store in Miles City. The Kluvers told Doug that they had met with a tax attorney who informed them that the proceeds from the settlement would not be as great as they had anticipated, and they therefore were having reservations about accepting the settlement. On September 14, 2010, at the insistence of the Kluvers, Ruggiero filed a Notice Regarding Failure of Settlement Discussions. It stated that the “tentative settlement has now failed and has resulted in no final, enforceable settlement agreement.”
¶8 Approximately two weeks later, the Power Companies filed a Motion to Enforce Settlement Agreement and Request for Evidentiary Hearing, arguing that the MOU was a written and signed settlement agreement. They attached affidavits of Rogers, Criswell, and Redshaw discussing the negotiations at the mediation. Later, Beck, Ruggiero and Engel also filed affidavits with the court reporting what occurred at the mediation.
¶9 The Kluvers objected to the Power Companies’ Motion and filed a Motion to Strike the Defendants’ Brief and Affidavits. They maintained there was no enforceable settlement agreement and that the Power Companies relied upon confidential and privileged settlement negotiations that were inadmissible pursuant to the mediation confidentiality statute. The McRaes did not share the same position as the Kluvers; instead, they agreed with the Power Companies that the MOU was an enforceable agreement.
*106 ¶10 Several motions followed, which prompted the District Court to order a hearing for February 17,2011. Following the hearing, the court ordered, among other things, that the Kluvers waived any right to confidentiality of the fact of a settlement and that the affidavits presented by the Power Companies were admissible. It ordered the mediator to submit a report to the court indicating whether a settlement was reached. It further scheduled an evidentiary hearing for March 21,2011, to determine whether the MOU was an enforceable settlement agreement.
¶11 Pursuant to the District Court’s order, the mediator filed a report on March 21, 2011, stating that the case had settled at the July 14, 2010, mediation.
¶12 At the March 21, 2011, evidentiary hearing, Rogers, Ruggiero, Beck, Criswell and the McRaes testified. The Kluvers did not. Among other things, the witnesses testified that the case settled at the mediation and the MOU and map were a final expression of the terms of the settlement. The testimony revealed details about the mediation process, including how the MOU was created and transmitted between the parties. Specifically, Ruggiero testified that during the mediation he sat in the same room as the Kluvers and that they authorized him to draft and send the MOU to opposing counsel at the conclusion of the mediation. The witnesses also explained some of the MOU’s terms, particularly those involving the land transactions and the “perpetual first option to purchase.” In addition, they addressed the parties’ failure to complete certain duties specified in the MOU within the required 60-day period following the mediation. Rogers testified that because the Kluvers had fired their counsel, they could no longer communicate with them regarding these tasks. The McRaes also provided testimony regarding the conversations they had with the Kluvers following the mediation.
¶13 During the hearing, the MOU and map were admitted into evidence.
¶14 On October 20, 2011, the court issued its Findings of Fact, Conclusions of Law, and Order, in which it granted the Power Companies’ and McRaes’ (collectively “Appellees”) Motion to Enforce the Settlement Agreement, and ordered the parties to complete the settlement set forth in the MOU within 60 days. The Kluvers appealed this order, along with the court’s February 23, 2011, order involving rulings on the evidentiary motions. We heard oral argument on September 21, 2012, and the matter is now ripe for disposition.
*107 ¶15 The parties raise several arguments on appeal. We address the following three issues:
¶16 Issue One: Did the District Court err hy finding that the MOU was a binding, enforceable settlement agreement?
¶17 Issue Two: Did the District Court err by allowing parol evidence to change an option to purchase into a right of first refusal?
¶18 Issue Three: Did the District Court err in allowing evidence about the conduct of the mediation, including testimony from the Kluvers’ former attorneys and the mediator, to determine whether the parties reached a binding settlement agreement during the mediation?
STANDARD OF REVIEW
¶19 Both the existence of a contract and its interpretation are questions of law which we review for correctness. Hurly v. Lake Cabin Dev., LLC, 2012 MT 77, ¶ 14, 364 Mont. 425, 276 P.3d 854. We review a trial court’s factual findings for clear error. Hurly, ¶ 14. A trial court has broad discretion in determining the relevance and admissibility of evidence. State v. Derbyshire, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. However, the trial court is bound by the Rules of Evidence or applicable statutes. Derbyshire, ¶ 19. The trial court’s interpretation and construction of a statute or rule is a matter of law, which we review de novo to determine whether the court’s interpretation and construction of the statute or rule is correct. State v. Dist. Ct. of the Eighteenth Jud. Dist., 2010 MT 263, ¶ 31, 358 Mont. 325, 246 P.3d 415.
DISCUSSION
¶20 Issue One: Did the District Court err by finding that the MOU was a binding, enforceable settlement agreement?
Statute of Frauds and the Uniform Electronic. Transactions Act
¶21 The Kluvers argue that neither they nor Ruggiero signed the MOU, and the agreement therefore does not satisfy the statute of frauds. The statute of frauds is codified in §§ 28-2-903 and 70-20-101, MCA. Pursuant to § 28-2-903(l)(d), MCA, “an agreement for the leasing for a longer period than 1 year or for the sale of real property ... is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged.” Additionally, § 70-20-101, MCA, provides that an interest in real property may not be transferred unless there is an instrument in writing, subscribed by the party transferring it or by the party’s lawful agent authorized by *108 writing. Hayes v. Hartelius, 215 Mont. 391, 396, 697 P.2d 1349, 1353 (1985).
¶22 The Kluvers contend that the District Court improperly relied on the Uniform Electronic Transactions Act (UETA) “to dispense with the requirement of a signature by either Kluvers or their supposed agent.” The UETA was adopted by the Montana Legislature in 2001 to address the increase in electronic transactions. The hope was for the Act to allow more business to be done electronically. See Mont. H. Comm, on Bus. and Lab., Minutes of the Hearing on H. Bill 234, 57th Legis., Reg. Sess., page 7 (Jan. 16, 2001). The bill’s sponsor stated that its passage would show a confidence in electronic transactions as a legal process. See Mont. H. Comm, on Bus. and Lab., Minutes of the Hearing on H. Bill 234, 57th Legis., Reg. Sess., page 8 (Jan. 16, 2001).
f 23 With this in mind, we turn to the relevant portions of the UETA and their applicability to the case before us. The UETA applies to transactions between parties who have agreed to transact by electronic means. Section 30-18-104(2), MCA. This is determined by the context and surrounding circumstances, including the parties’ conduct. Section 30-18-104(2), MCA. The UETA provides that a record, signature or contract may not be denied legal effect or enforceability solely because it is in electronic form. Sections 30-18-106(1), (2), MCA. Further, “if a law requires a record to be in writing, an electronic record satisfies the law,” and “if a law requires a signature, an electronic signature satisfies the law.” Sections 30-18-106(3), (4), MCA. An electronic signature is an “electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record.” Section 30-18-102(9), MCA. To determine the effect of an electronic signature, we look to the “context and surrounding circumstances at the time of its creation, execution, or adoption, including the parties’ agreement ....” Section 30-18-108, MCA.
¶24 Here, it is clear from the MOU that the parties agreed to memorialize the terms of their settlement by electronic means. The MOU is a writing created in email format on Ruggiero’s computer during the mediation and explicitly states that the parties reviewed and approved it. At the conclusion of the mediation, it was transmitted by email from Ruggiero to Rogers. Even so, the Kluvers maintain that there is no evidence that they agreed to sell their land by electronic means. In making this argument, the Kluvers not only disregard the MOU, but also the statements Karson Kluver made to the McRaes after the mediation acknowledging that a settlement had been reached *109 at the mediation. Because the MOU was the only settlement agreement that resulted from the mediation, Karson Kluver’s statements corroborate that the parties intended to memorialize their agreement electronically. The UETA therefore applies.
¶25 Further, it is evident on the face of the MOU that Ruggiero, as an agent for the Kluvers and McRaes, provided the requisite electronic signature. In addition to the UETA, the District Court relied on Hillstrom v. Gosnay, 188 Mont. 388, 614 P.2d 466 (1980) to determine that the MOU was a signed document. Although decided prior to the UETA, Hillstrom is consistent with the UETA’s recognition of the validity of electronic signatures. In Hillstrom, we noted that although we had not yet ruled on what constitutes a valid subscription for purposes of the statute of frauds, “[ojther courts ... have consistently held that any mark affixed to a writing with the intent to authenticate it constitutes a sufficient subscription by the party sought to be charged.” Hillstrom, 188 Mont. at 394, 614 P.2d at 469 (internal citations omitted). We determined that a typewritten name at the bottom of a telegram was a sufficient subscription to satisfy the requirements of the statute of frauds. Hillstrom, 188 Mont. at 394, 614 P.2d at 469. Further, we found the subscriber’s intent to authenticate her typewritten name on the telegram as her valid subscription was established on the face of the telegram which states, “PLEASE CONSIDER THIS MY WRITTEN ACCEPTANCE ...” Hillstrom, 188 Mont. at 395, 614 P.2d at 470.
¶26 Here, Appellees point to the paragraph at the bottom of the MOU that states, “This Memorandum has been reviewed and approved by the parties and their counsel copied herein,” as the necessary “symbol” of an electronic signature. We find that this statement, taken together with the fact that the email containing the MOU designates Ruggiero as the sender-his name is specifically typed out in front of his email address in the “From” section of the email-and Rogers as the recipient, and was sent from Ruggiero to Rogers at the conclusion of the mediation, provide the necessary symbol and intent to authenticate to constitute Ruggiero’s electronic signature.
¶27 The Kluvers argue that even if Ruggiero did sign the MOU, it is invalid because they never gave him written authorization to bind them to a contract to sell land. Pursuant to § 28-2-903(l)(d), MCA, an agreement for the sale of real property, “if made by an agent of the party sought to be charged, is invalid unless the authority of the agent is in writing and subscribed by the party sought to be charged.” See also Schwedes v. Romain, 179 Mont. 466, 471, 587 P.2d 388, 391 *110 (1978). Appellees concede that there was no written authorization, but assert that an exception to this rule exists when the principal is in the physical presence of the agent and directs the agent to act. They rely on a California case, Videau v. Griffin, 21 Cal. 389, 392 (Cal. 1863), in which the California Supreme Court held:
The only exception to the rule that an authority to execute a deed must be conferred by writing, is where the execution by the attorney is in the presence of the principal. The exception arises from the doctrine that what one does in the presence of and by the direction of another is the act of the latter-as much so as if it were done by himself in person.
Other jurisdictions have carved out similar exceptions.[3]
¶28 The cases the Kluvers rely upon in support of their position are distinguishable from the present case. In each of those cases, not only was there no written authorization from the principal, but there was no indication that the agent was acting while in the physical presence of the principal. See Zier v. Lewis, 2009 MT 266, 352 Mont. 76, 218 P.3d 465; Mahoney v. Lester, 118 Mont. 551, 168 P.2d 339; Schmidt v. White, 43 S.W.3d 871 (Mo. App. 2001); Central Idaho Agency, Inc. v. Turner, 442 P.2d 442 (Idaho 1968); Guel v. Bullock, 468 N.E.2d 811 (Ill. App. 1984); Tostenson v. Ihland, 147 N.W.2d 104 (N.D. 1966); Bennett v. First Natl. Bank of Glens Falls, 536 N.Y.S.2d 591 (N.Y. App. Div. 1989). We are in accord with the proposition that when an agent and principal are in physical proximity, such as in the context of a mediation session, the principal can authorize the agent to sign a contract involving realty on the principal’s behalf without written authorization.
¶29 Here, while the Kluvers allege that they were not in the same room as Ruggiero when he sent the MOU, the District Court did not make such a finding, and the Kluvers do not specifically challenge the court’s failure to do so. We conclude that because Ruggiero attended the entire mediation with the Kluvers as their attorney, the MOU *111 explicitly states that the parties reviewed and approved it, and Karson Kluver later told the McRaes that a settlement had been reached, there is no clear error in the District Court’s finding that the Kluvers authorized Ruggiero to agree to the MOU.
¶30 Furthermore, the purpose of the statute of frauds is to prevent fraud. In this case, the McRaes presented unchallenged testimony that Karson Kluver acknowledged the settlement when he visited their home a few days after the mediation. In Hayes, we determined that the statute of frauds was inapplicable when the parties admitted the existence of a contract. We pointed out that “[t]his Court has taken the position on several occasions that it will not allow the statute of frauds, the object of which is to prevent fraud, to be used to accomplish fraudulent purposes.” Hayes, 215 Mont. at 396, 697 P.2d at 1353 (internal citations omitted). There, we stated that “it would be a fraud on the defendant to allow plaintiffs to admit to the contract, and then allow them to avoid its obligations by asserting the statute of frauds.” Hayes, 215 Mont. at 396, 697 P.2d at 1353. See also Hillstrom, 188 Mont. at 396, 614 P.2d at 470 (stating that “in cases involving admitted contracts, we have construed the statute of frauds less technically, refusing to allow the statute to be used so as to defeat its purpose to prevent the commission of a fraud.”). Here, because Karson Kluver acknowledged that a settlement had been reached when he spoke with the McRaes after the mediation, he cannot now attempt to invoke the statute of frauds to deny the existence of such an agreement.
Essential Terms of the MOU
¶31 Settlement agreements are contracts, subject to the provisions of contract law. Murphy v. Home Depot, 2012 MT 23, ¶ 8, 364 Mont. 27, 270 P.3d 72. A contract requires (1) identifiable parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration. Hurly, ¶ 17 (citing § 28-2-102, MCA). A contract must contain all its essential terms in order to be binding. Hurly, ¶ 17.
¶32 Here, the District Court found that the MOU and map contain all of the material terms of a contract, and concluded that they constitute an enforceable settlement agreement. The parties do not dispute that the MOU identifies parties capable of contracting. Nor do they challenge that there is sufficient consideration-the MOU provides an amount of money to be paid by the Power Companies to the Kluvers and McRaes, real estate to be transferred from the Kluvers to the Power Companies, a leaseback, a right of first refusal, and a release of *112 future claims. The Kluvers contend, however, that the MOU lacks consent and contains illegal objects.
¶33 With respect to their consent argument, the Kluvers claim the MOU is an unenforceable agreement to agree, and that the parties’ statements and conduct indicate their intent not to be bound. The intentions of parties are those disclosed and agreed to in the course of negotiations. Hetherington v. Ford Motor Co., 257 Mont. 395, 399, 849 P.2d 1039, 1042 (1993). A party is bound to a settlement agreement if “he or she has manifested assent to the agreement’s terms and has not manifested an intent not to be bound by that assent.” Lockhead v. Weinstein, 2003 MT 360, ¶ 12, 319 Mont. 62, 81 P.3d 1284 (citing Hetherington, 257 Mont. at 399, 849 P.2d at 1042). In other words, if parties unconditionally consent to an agreement, they are bound. Murphy, ¶ 8 (citing Lockhead, ¶ 13). A party’s latent, or undisclosed, intention not to be bound does not prevent the formation of a binding contract. Murphy, ¶ 8 (citing Lockhead, ¶ 11).
¶34 In Marta Corp. v. Thoft, 271 Mont. 109, 894 P.2d 333 (1995), we held the parties were bound to a settlement agreement when they agreed to general terms at a settlement conference and their attorneys subsequently prepared a written stipulation. After the stipulation was drafted and signed by counsel, one of the parties argued it was unacceptable and refused to comply with its terms. We determined that because the parties were present and represented at the settlement conference, at which time the general terms of the stipulation were formulated and agreed to by the parties, and there were no conditions placed on the parties’ acceptance of the agreement, the parties were bound by the terms of the written stipulation. Marta, 271 Mont. at 113, 894 P.2d at 335. “That Appellants no longer wish to be bound by the settlement agreement, as set forth in the written stipulation, does not excuse them from complying with the terms of that stipulation.” Marta, 271 Mont. at 113, 894 P.2d at 335.
¶35 In the instant case, the District Court found that the Kluvers assented to the terms of the MOU and map at the mediation. While the court’s finding was based upon evidence that included testimony from the evidentiary hearing discussing the mediation, we arrive at the same conclusion by looking solely at the MOU and map. Similar to Marta, the Kluvers were present and represented at the mediation when the terms of the MOU were negotiated. The MOU contains an explicit statement that it was “reviewed and approved” by the parties. Further, like Marta, there is nothing on the face of the MOU *113 suggesting that the Kluvers did not intend to be bound by it, or that their acceptance was conditional or contingent in any way.
¶36 The Kluvers argue that since the settlement gave the parties additional time to prepare final documents, all of the essential terms were not agreed to at the end of the mediation and the MOU was thus an unenforceable agreement to agree. This Court has held that where parties intend to form a binding agreement, the fact that they plan to incorporate it into a more formal contract in the future does not render it unenforceable. Steen v. Rustad, 132 Mont. 96, 104, 313 P.2d 1014, 1019 (1957). “[AJbsolute certainty and completeness in every detail is not a prerequisite of specific performance, only reasonable certainty and completeness being required. Those matters which are merely subsidiary, collateral, or which go to the performance of the contract are not essential, and therefore need not be expressed in the informal agreement.” Steen, 132 Mont. at 106, 313 P.2d at 1020 (internal citations omitted).
¶37 In our recent decision in Hurly, we found there was an enforceable agreement between Lake Cabin, a company seeking to acquire real estate for development purposes, and Hurly, a landowner, even though the contract left specifications regarding some of its terms to be settled later. Hurly, ¶¶ 21-22. The two parties signed an agreement providing that Hurly would sell his property to Lake Cabin in exchange for certain cash payments and the building of additional structures on the lot, including houses, garages, and a dock. Hurly, ¶ 7. Although the parties stipulated that there were details regarding the structures that would later have to be decided on, such as the floor plans, we determined there was sufficient information provided in the contract “to make the parties’ obligations ‘clearly ascertainable.’ ’’Hurly, ¶ 21 (quoting GRB Farm v. Christman Ranch, Inc., 2005 MT 59, ¶ 11, 326 Mont. 236, 108 P.3d 507). The fact that the parties provided for general plans in the contract but left specifications to be settled later “indicate[d] their understanding that these additional terms were not material.” Hurly, ¶ 21. We concluded the agreement included all essential terms to find it was a binding and enforceable contract. Hurly, ¶ 22.
¶38 Here, like Hurly, the parties’ decision to include all of the terms they were agreeing to in the MOU and map, but allow the necessary documents related to the land transactions to be completed in the weeks following the mediation, indicates their recognition that the documents would not involve new, material terms. We find that the MOU contains all the information necessary to create the documents *114 and to make the parties’ obligations “clearly ascertainable.” Therefore, the fact that there was not “absolute certainty and completeness in every detail” of the MOU does not render it unenforceable.
¶39 The Kluvers also put much weight on the fact that the parties described the MOU as a “draft” and a “tentative settlement” in post-MOU communications, arguing this indicates there was no binding agreement. The District Court found that while the use of the word “tentative” in the Notice was “inartful and, in hindsight, imprecise, none of it constitutes an admission or supports an inference that the MOU and the map did not express a final, agreed-upon settlement, nor do any of these post-mediation statements constitute an agreement by the parties to, in any fashion, amend or change the material terms of settlement described in the map and the MOU.” We agree. As just discussed, there is nothing in the MOU that indicates the parties’ intent was for it to be anything but an enforceable agreement.
¶40 The Kluvers additionally argue, albeit very briefly, that the MOU is unenforceable because it contains illegal objects. We find these arguments unpersuasive and agree with the District Court’s conclusion that the provisions of the MOU are legal under Montana law.
¶41 Lastly, the Kluvers raise the point that the parties failed to perform their duties within the 60-day period set forth in the MOU. Although Appellees argue that they were precluded from doing so because the Kluvers fired their counsel and stopped communication with them, the District Court made no such finding. This Court has adopted the doctrine of implied findings for the purpose of reviewing findings of fact. The doctrine provides that where findings of fact “ ‘are general in terms, any findings not specifically made, but necessary to the [determination], are deemed to have been implied, if supported by the evidence.’ ” In re Whyte, 2012 MT 45, ¶ 41, 364 Mont. 219, 272 P.3d 102 (quoting In re Transfer of Location for Mont. All-Alcoholic Bevs. Resort, 2008 MT 165, ¶ 29, 343 Mont. 331, 184 P.3d 324). In the instant case, the evidence in the record, combined with the District Court’s specific findings of fact, support a finding that the duties were not completed in the 60-day period because the Kluvers were in the process of firing their counsel and attempting to rescind the agreement.
¶42 For the foregoing reasons, we conclude the District Court did not err by finding that the MOU was a binding, enforceable settlement agreement.
¶43 Issue Two: Did the District Court err by “re-writing” the MOU to change an option to purchase into a right of first refusal?
*115 ¶44 The Kluvers argue the District Court should not have admitted parol evidence to determine the meaning of the “perpetual first option to purchase” in the MOU. By doing so, they assert the court converted the option to purchase into a right of first refusal.
¶45 The provision in the MOU reads:
Within 60 days, Defendants and Plaintiffs shall enter into a perpetual first option to purchase whereby Plaintiffs, their heirs and assigns shall be entitled to the first right to purchase [all land conveyed above and Section Nine] for the sum of One (1) dollar.
In its order, the District Court instructed the parties to complete the settlement set forth in the MOU and map, which shall include “the creation of an instrument providing the Kluver Plaintiffs the right to purchase the land conveyed for a sum of One Dollar ($1.00) upon Defendants’ decision to convey the property.” While the Kluvers claim the court altered the terms of the MOU, Appellees maintain that when the language of the MOU is read in context of the entire agreement, it is clear that the parties always intended a right of first refusal.
¶46 Section 28-3-402, MCA, provides that a contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. Courts generally “read the instrument as a whole to determine whether the parties intended an option or a right of first refusal.” Lee v. Shaw, 251 Mont. 118, 122, 822 P.2d 1061, 1062 (1991); see also Steen, 132 Mont. at 102, 313 P.2d at 1018 (stating that “[i]t is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in the light of the entire instrument, ascertain the paramount and guiding intention of the parties.”). An option to purchase is a right acquired by a contract by which the owner of property agrees with another person that he shall have the right to buy his property at a fixed price within a certain time. Lee, 251 Mont. at 121, 822 P.2d at 1062. The offer “creatfes] in the optionee a power to compel the owner to sell property at a stipulated price whether or not the owner wishes to sell.” Lee, 251 Mont. at 121, 822 P.2d at 1062. A right of first refusal, on the other hand, is a “preemptive right” that requires the owner of property “when and if he decides to sell, to offer the property first to the person entitled to the preemption, at the stipulated price.” Lee, 251 Mont. at 121, 822 P.2d at 1062.
¶47 Here, although the wording of the “perpetual first option to purchase” in the MOU is inartful, when read in context of the entire agreement and the “matter to which it relates,” it is evident that the *116 parties intended to agree to a right of first refusal instead of an option. The MOU specifically provides a “first” option and a “first” right. Given the meanings of an option to purchase and a right of refusal, the use of the word “first” only has significance when talking about rights of refusal. A “first option to purchase” makes sense when referring to a party who has the opportunity to buy property before anyone else in the event the owners intend to sell-this is a right of first refusal. In an-option, as Appellees point out, there is no concern about being secondary because the party always has the right to buy the property, for the specified period of time.
¶48 Further, the purpose of the mediation was to resolve the Kluvers’ and McRaes’ claims against the Power Companies and give them protection against future litigation. Among other things, the Power Companies agreed in the MOU to pay the Kluvers and McRaes a sum of money, and the Kluvers promised to transfer them their land. The MOU also provides for a leaseback to the Kluvers so they can continue to use the property. These land transactions were a substantial part of the MOU. They demonstrate the importance to the Power Companies that they own the land to protect against future claims, and to the Kluvers that they continue to use the land and ultimately have the opportunity to purchase it back when the Power Companies sell. Given the purpose and context of the MOU, it does not make sense that the parties would make these agreements, but intend for the Kluvers to have the option to purchase all the land back at any time-perhaps even the next day-for $1. Instead, it is clear that the parties intended to agree to a right of first refusal.
¶49 Although the District Court admitted testimony discussing the meaning of this provision of the MOU, the MOU alone is sufficient to support the court’s conclusion that the parties agreed to a right of first refusal. The District Court therefore did not “convert” a material term of the MOU.
¶50 Issue Three: Did the District Court err in allowing evidence about the conduct of the mediation, including testimony from the Kluvers’ former attorneys and the mediator, to determine whether the parties reached a binding settlement agreement during the mediation?
¶51 The Kluvers argue the District Court violated both the mediation statute and the attorney-client privilege by allowing evidence about the conduct and communications that occurred at the mediation. We address each of these arguments in turn.
*117 Mediation Statute
¶52 Montana law expressly prohibits the disclosure of “all mediation-related communications, verbal or written” made during mediation absent consent or an express statutory exception. Section 26-1-813(3), MCA. The statute affords broad protection of mediation confidentiality, providing, in relevant part:
(2) Except upon written agreement of the parties and the mediator, mediation proceedings must be:
(a) confidential...
(3) A mediator’s files and records, with the exception of signed, written agreements, are closed to all persons unless the parties and the mediator mutually agree otherwise. Except as provided in subsection (5), all mediation-related communications, verbal or written, between the parties or from the parties to the mediator and any information and evidence presented to the mediator during the proceedings are confidential. The mediator’s report, if any, and the information or recommendations contained in it, with the exception of a signed, written agreement, are not admissible as evidence in any action subsequently brought in any court of law... and are not subject to discovery or subpoena in any court... unless all parties waive the rights to confidentiality and privilege.
(4) Except as provided in subsection (5), the parties to the mediation and a mediator are not subject to subpoena by any court ... and may not be examined in any action as to any communication made during the course of the mediation proceeding without the consent of the parties to the mediation and the mediator.
(5) The confidentiality and privilege provisions of this section do not apply to information revealed in a mediation if disclosure is:
(a) required by any statute;
(b) agreed to by the parties and the mediator in writing ...; or
(c) necessary to establish a claim or defense on behalf of the mediator in a controversy between a party to the mediation and the mediator.
¶53 The District Court concluded that since the Kluvers acknowledged the existence of a settlement to the McRaes after the mediation, they waived their mediation confidentiality rights. The Kluvers argue that this conversation is not a valid waiver of rights under § 26-1-813, MCA. In the construction of a statute, this Court’s job is “simply to ascertain and declare what is in terms or in substance contained *118 therein, not to insert what has been omitted or to omit what has been inserted.” Section 1-2-101, MCA. The plain language of this statute requires a written waiver by all the parties and the mediator before their confidentiality rights can be waived. Section 26-l-813(5)(b), MCA (emphasis added). Here, there is no evidence of a written waiver signed by the parties and the mediator, and we thus determine the Kluvers did not waive the confidentiality provided by § 26-1-813, MCA.
¶54 The Kluvers assert that the District Court erred when it allowed into evidence numerous mediation-related communications, including the MOU, and when it ordered the mediator to file a report. They argue that since none of the exceptions apply, all evidence relating to what occurred at the mediation was inadmissible.
¶55 “In interpreting a statute, we look first to the plain meaning of the words it contains. Where the language is clear and unambiguous, the statute speaks for itself and we will not resort to other means of interpretation.” Rocky Mt. Bank v. Stuart, 280 Mont. 74, 80, 928 P.2d 243, 246 (1996) (internal citations omitted). Here, with regard to some of the evidence at issue, the statute is very clear. Section 26-1-813(3), MCA, states, and the Kluvers concede, that a signed, written agreement created during the mediation is admissible. We have already determined such an agreement exists; therefore, the court did not err in admitting the MOU into evidence. The statute also plainly provides that it protects communications that took place during the course of the mediation proceeding, but does not cover conversations regarding the mediation that occurred at a later time and place. See In re Estate of Stukey, 2004 MT 279, ¶ 71, 323 Mont. 241, 100 P.3d 114 (determining that because a letter referencing mediation was written post-mediation it was “thus, not a part of the mediation process, [and] § 26-1-813, MCA, is inapplicable.”). Therefore, evidence regarding conversations that occurred between the Kluvers and McRaes after the mediation was not protected. Finally, with regard to the mediator’s report, the plain language of the statute is clear- “the mediator’s report, if any, and the information or recommendations contained in it” are confidential. We recognize that the Uniform Mediation Act, as well as some jurisdictions,[4] has created an exception to the inadmissibility of mediator reports to allow mediators to disclose to the court whether a settlement was reached at mediation. Our Legislature, *119 however, has not written this exception into the statute, and until it decides to do so, all mediator reports are confidential. The court thus erred in requiring the mediator to file his report.
¶56 With respect to all of the evidence the District Court admitted that involved communications made during the mediation, Appellees argue they were “really more ministerial (e.g., here is our offer, I accept your offer, this constitutes our agreement) than compromise,” and pertained more to conduct than actual conversations. Hence, they claim, such evidence was not protected by § 26-1-813, MCA. We disagree. While the statute does not explicitly state what does and does not constitute a “communication” for purposes of confidentiality, we can make such a determination by looking at its plain language, legislative history, and other jurisdictions’ interpretation of similar statutes. The Montana Legislature adopted § 26-1-813, MCA (1999), to preserve confidentiality in mediation. Proponents of the bill emphasized that mediation was a growing method of resolving disputes, founded on two key principles-that the parties feel free to speak their mind, and that their confidence will be maintained. See Mont. Sen. Comm, on Jud., Minutes of the Hearing on H. Bill 593, 56th Legis., Reg. Sess., page 11 (March 15, 1999). Because the statute is designed to promote a candid exchange, the participants must be assured that what they say will not be used against them through later court proceedings.
¶57 Idaho adopted a mediation confidentiality statute similar to Montana’s. It specifically defines mediation communication as a “statement, whether oral or in a record or verbal or nonverbal, that occurs during a mediation ....” Idaho Code § 9-802(2). This is the same definition found in the Uniform Mediation Act. See Unif. Mediation Act § 2(2) (2001). More specifically, the comment to this statute provides that communications “include both statements and conduct meant to inform, because the purpose of the privilege is to promote candid mediation communications.” Idaho Code § 9-802(2), cmmt 2. If nonverbal conduct is intended as an assertion, such as nodding, it would be a “communication.” Idaho Code § 9-802(2), cmmt 2. By contrast, if the conduct was not meant by the actor as an assertion, “such as smoking a cigarette during the mediation” or the actor’s “physical presence” at the mediation, the conduct typically would not be a “communication.” Idaho Code § 9-802(2), cmmt 2.
¶58 This description of what constitutes “mediation communication” is in conformity with the broad policy of mediation confidentiality in § 26-1-813, MCA. We therefore determine that all of the evidence of *120 conversations and conduct that occurred at the mediation was confidential under § 26-1-813, MCA, with the exception of such information as who was physically present at the mediation, when it began and ended, and any other non-verbal conduct that was not intended as an assertion)
¶59 We note that since the statute does not include any special provisions allowing disclosure of confidential information to prove or refute contract defenses, parties arguing for or against the enforceability of a contract created during mediation are quite limited in the evidence they can use to support their case. Some state legislatures have addressed this issue by explicitly providing exceptions to mediation confidentiality in their statutes when the enforceability of the mediated agreement is at issue.[5] However, our Legislature conspicuously did not, and to carry out its purpose of encouraging mediation by ensuring strict confidentiality we are reluctant to allow exceptions. As stated above, it is not the job of this Court to insert into those statutes what the Legislature has chosen to omit.
¶60 Here, although we conclude that the District Court erred by admitting evidence protected under the mediation confidentiality statute, we hold that such error was harmless. “ ‘[H] armless error does not mandate that we reverse a district court judgment; an error must cause substantial prejudice to warrant reversal.’ ” In re Mental Health of A.S.B., 2008 MT 82, ¶ 36, 342 Mont. 169, 180 P.3d 625 (quoting Matter of S.C. and L.Z., 2005 MT 241, ¶ 29, 328 Mont. 476, 121 P.3d 552). The MOU, map, and post-mediation conversations between Karson Kluver and the McRaes-all admissible under § 26-1-813, MCA-are sufficient evidence to find that the parties entered into a binding, enforceable agreement at the mediation. Thus, even if the District Court had excluded the confidential information from the mediation, it would have arrived at the same conclusion. Therefore, the District Court’s incorporation of confidential information was harmless error.
*121 Attorney-Client Privilege
¶61 The KLuvers further argue that the District Court violated the attorney-client privilege when it admitted into evidence mediation-related communications. However, since we determined that admitting this evidence in violation of § 26-1-813, MCA, was harmless error, the same would be true if it violated attorney-client privilege-we still would have sufficient admissible evidence supporting the District Court’s conclusion that the MOU was an enforceable agreement. We therefore need not decide whether admitting such evidence violated the attorney-client privilege.
CONCLUSION
¶62 We hold the District Court erred in admitting evidence protected by the mediation confidentiality statute. We conclude, however, that the error was harmless. Therefore, we hold the District Court properly granted the motion to enforce the settlement agreement.
¶63 Affirmed.
CHIEF JUSTICE McGRATH, JUSTICES BAKER, RICE and MORRIS concur.

 Hydrometrics, Inc. was also a defendant in the case. The claims against the corporation were resolved through settlement, and the cause of action against Hydrometrics was consequently dismissed with prejudice.

 The parties agreed that the amount to be paid by the Defendants to the Plaintiffs would remain confidential.

 See e.g. Bigler v. Baker, 58 N.W. 1026, 1029 (Neb. 1894) (“[t]he character of a power under which an agent may execute a deed for another depends upon the presence or absence of the principal. If it is signed in his presence by his direction, an oral request to do the act is all that is required.”) (Internal citation omitted); Leaf v. Codd, 240 P. 593, 596 (Idaho 1925) (“[o]ne may write and execute an instrument by the hand of another when done in his presence and by his direction, and the fact may be proved by parol evidence, and an action may be brought upon the instrument without violating the statute of frauds.”).

 See e.g. Idaho Code § 9-807(2)(a) (“A mediator may disclose ... [wlhether the mediation occurred or has terminated, whether a settlement was reached, and attendance....”).

 See e.g. Wyo. Stat. § 1-43-103 (provides there is no mediation confidentiality if “one of the parties seeks judicial enforcement of the mediated agreement.”); La. R.S. 9:4112 (allows an exception to mediation confidentiality if the court “determines that testimony concerning what occurred in the mediation proceeding is necessary to prevent fraud or manifest injustice.”); Wis. Stat. § 904.085 (provides an exception to mediation confidentiality if the court “determines that admission is necessary to prevent a manifest injustice ....”).